

# Missouri Court of Appeals
### Southern District
### Division Two

JAMES MASSEY,              )
                       )
     Plaintiff-Respondent,    )
                       )
vs.                     )    No. SD33170
                       )
DEARL DON EUGENE MASSEY,  )    Filed July 2, 2015
Trustee of the Ina Wade Revocable Living )
Trust, and BETTY RODERICK,    )
GARY E. MASSEY, INA LEE MASSEY  )
KALINA, TAMMY SUE MASSEY    )
RICHARDSON, KEELI HURST,    )
                       )
     Defendants-Respondents,    )
                       )
SHANE HURST,          )
                       )
     Defendant-Appellant.    )

### APPEAL FROM THE CIRCUIT COURT OF TEXAS COUNTY

Honorable John D. Wiggins, Senior Judge

REVERSED AND REMANDED

Shane Hurst appeals the trial court's judgment declaring that Ina Wade amended her trust by oral statements and written memoranda and consequently awarding Ina's farm to James Massey.[1]  In his second of three points on appeal, Shane asserts that the judgment is against the

---

[1] James died on March 26, 2014, after Shane had filed this appeal.  As personal representative of James' estate, his wife, Leta Massey, was substituted as a respondent on June 16, 2014.  For purposes of consistency and clarity, however, this opinion will continue to refer to James as the respondent after that date.  In addition, several of the family members involved in this case share the same last name.  After first identifying each by his or her full name,

weight of the evidence. We agree, reverse the judgment, and remand the case for further proceedings consistent with this opinion. Because this point is dispositive of the appeal, we do not address Shane's other two points.

## Applicable Standard of Review and Principles of Law

"The standard of review in a declaratory judgment action is the same as in any other court-tried case. The judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." ***Rouner v. Wise***, 446 S.W.3d 242, 248-49 (Mo. banc 2014) (internal quotation marks and citations omitted).

"This Court will overturn a trial court's judgment on the ground that it is against the weight of the evidence—with the term 'weight' referring to the probative value (not quantity) of the evidence—only if it has a firm belief that the judgment is wrong." ***Pearson v. Koster***, 367 S.W.3d 36, 51 (Mo. banc 2012) (citing ***White v. Dir. of Revenue***, 321 S.W.3d 298, 308-09 (Mo. banc 2010)). This rarely occurs. ***Pearson***, 367 S.W.3d at 52.

> When reviewing the record in an against-the-weight-of-the-evidence challenge, this Court defers to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court depend on credibility determinations. A circuit court's judgment is against the weight of the evidence only if the circuit court could not have *reasonably* found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. When the evidence poses two *reasonable* but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence.

***Ivie v. Smith***, 439 S.W.3d 189, 206 (Mo. banc 2014) (internal citations omitted and emphasis added). "[T]his standard of review takes into consideration which party has the burden of proof and that the circuit court is free to believe all, some, or none of the evidence offered to prove a contested fact[.]" ***Id.*** "Evidence not based on a credibility determination, contrary to the circuit

---

this opinion will only thereafter reference each by his or her first name. Once again, this convention is used for clarity and is not intended to convey any disrespect or familiarity.

court's judgment, can be considered in an appellate court's review of an against-the-weight-of-the-evidence challenge." *Id.*

In order to succeed in challenging a judgment as against the weight of the evidence, an appellant must complete a four-step analysis:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,

(4) demonstrate why the favorable evidence, along with the *reasonable* inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Houston v. Crider*, 317 S.W.3d 178, 187 (Mo.App. 2010) (emphasis added).

We must "act with caution in exercising the power to set aside a decree or judgment on the ground that it is against the weight of the evidence." *Ivie*, 439 S.W.3d at 205. "'[A] claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment.'" *Id.* at 205-06 (quoting *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 630 (Mo. banc 2014) (alteration omitted)). Rather, an against-the-weight-of-the-evidence claim triggers an appellate test "of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact." *Id.* (citing *White*, 321 S.W.3d at 309). This "standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong." *Id.*

3

The following facts are set out in compliance with the second step discussed in *Houston*—identify the evidence favorable to the challenged proposition. The other *Houston* steps will be addressed and discussed later in this opinion.

**Factual and Procedural Background**

Ina was born Ina Massey in February 1913 and was one of several Massey children, including Claude, Lyle, and Dearl. She later married Luther Wade and, upon the death of her parents, the couple purchased the 248-acre farm ("the Farm") where she and her brothers had been born. Ina had no children.

*Ina's Trust*

Six years after her husband's death, Ina executed a Declaration of Revocable Living Trust Agreement ("the Trust Agreement") in 1979 between herself as Grantor and as Trustee. She conveyed the Farm from herself as Grantor to herself as Trustee subject to the terms of the Trust Agreement. The first paragraph of section I of the Trust Agreement provided

> This Trust is revocable by Grantor. It may be revoked by the Grantor in whole or in part by the written election to terminate in part or in full and deliver such written election to the Trustee and the filing of such election in the Recorder's Office in the county in which any real estate is located. Legal representatives of the Grantor shall have no right or power to revoke. Grantor shall also have the right to alter and amend this Trust from time to time. Upon any revocation, the Trustee shall deliver to the Grantor any property on hand to which the trust has been revoked or amended, together with such deed or instruments as may be necessary to release any interest the Trustee may have in or to such property. No notice of revocation in whole or in part of this Trust shall be necessary to the Successor Trustee or any of the beneficiaries named herein. This trust shall be irrevocable upon the death of Grantor or during the incompetency of Grantor, if she should be declared incompetent.[2]

Ina's brother Dearl was named as successor trustee, followed by her brother Lyle as the next successor trustee. Section V of the Trust Agreement directed the successor trustee, upon Ina's

---

[2] All parties admitted in their respective pleadings that the Trust Agreement contains no directions or provisions for how the Grantor was to amend her trust.

4

death, to distribute the Farm to Dearl and Lyle in equal shares or such share to their respective descendants, if either died before Ina. The Trust Agreement was later filed for record in the Texas County Recorder's office.

In 1997, Ina executed a written amendment to the Trust Agreement, which revoked Section V and specified that Betty Roderick, one of Lyle's five children, was to be excluded from any distribution from the trust; at the same time, Ina also executed a will excluding Betty as a beneficiary of her estate. The trust amendment was initiated and completed with the services of an attorney and consisted of a formal, written document that was signed by Ina and notarized. This amendment was filed in the Texas County Recorder's Office.

Lyle Massey died in 2004 survived by his five children: Betty, Gary Massey, Ina Lee Massey Kalina, James Massey, and Tammy Sue Massey Richardson. Thereafter, James purchased Lyle's farm for $244,000; this purchase caused a rift between siblings, with Betty and Gary on one side and the remaining three on the other. James purchased the farm upon the advice of Ina, who approved of the sale price.

On April 11, 2005, Ina again amended her Trust by a written and notarized document, this time adding two witnesses to its authentication, as well. The amendment revoked Sections III and V of the Trust Agreement. Section III, which dealt with the naming of a successor trustee, was amended to name her brother Dearl, her nephew Don Massey,[3] and her niece Darith,[4] as successor trustees, in that order of succession. The amended Section V removed Lyle's name and reinstated Betty as a beneficiary, giving Lyle's previously provided one-half share equally to all five of his children. Ina again used the services of an attorney in initiating

---

[3] Don Massey's full name is Dearl Don Eugene Massey. He is referred to as Don in this opinion to distinguish him from Ina's brother Dearl. Don is the son of Ina's and Dearl's older brother, Claude.
[4] Darith was Dearl's daughter and subsequently died in 2006.

and completing this amendment.  This amendment was also recorded in the Texas County Recorder's Office.

Ina passed away at age 97 on July 11, 2010.

### Ina's Writings

Several handwritten notes made by Ina were admitted into evidence during the trial.  In its judgment, the trial court specifically referenced ten exhibits containing Ina's writings related to James and the farm.  <u>Exhibit 12</u> was found by Don in Ina's Bible on the day she died.  It had "February 28, 2007" written at the top and was written in two different colors.  On the back of the note was written "Family" in black.  The note states,[5]

> To Betty, Gary, Ina Lee, Jimie and Tammy
>
> As you all know, my estate was to be equally divided between Lyle and Dearl  As Lyle isn't here I am givig his one half to be equally divided between you five children to be shared and shared alike, If there is any confusion or trouble of any *way*/ one[6] they will be denied their 1/5 of my state
>      If any one has given me a gift of any kind, they can take it back if they want.  If not I want the rest of my estate to be put up for auction.  I also want all of you to help Dearl & Don to get my belongings ready for the auction, The realstate will probably be sold at a later date.  Dearl is my first exutor.  Don is my second—*Derith is my third*
>
>                              I love you all
>
>                    *nephew*
> *My wishes are that James Massey gets my farm  I want it to stay in the Massey family*
>
>                              *Ina Wade*
>
> *I have <u>not</u> promised anything to <u>any</u> one*
>
> Give my brown walking cane back to Joyce Washburn, it belong to her mother.

---

[5] All exhibits are reproduced here with spelling and punctuation as written; all ordinary text represents that written in blue, and all text written in black appears here in italics.
[6] The word "one" written in blue was overwritten with the word "way" in black.

Exhibit 20, which James testified was written sometime in 2007, was in a notebook that James found inside Ina's home.  It reads, "I—Ina Wade want James Massey my nephew to have my 248 acres farm at my death."

Exhibit 24 is written in two colors in Ina's handwriting on the inside of the front cover of another notebook.  It reads,

> *I want Jim Massey to have my farm he has it rented  I want no one church to have 500 Five hundred  I want Joyce Washburn to have 500 Five hundred each  My trust tells the rest*
>
> I want No one church[7] to have
>
> I want Joyce Washburn to have
>
> *10 Dona & Marcus visited*
>
> *12th Colone missing*
>
> *12 Red pants Red striped top Joyce gift*
>
> *14 Blanche & Fines here*
>
> *14 Black pants striped top shop*

Exhibit 26, which James testified was written in September of 2008, is written on both sides of a loose sheet of paper.  One side reads,

> *I want Jim Massey to have my Farm*
>
> *I want no one church to have 500/00*
>
> *I WANt Joyce WAShBURN to have 500/00*
> *~~Five hundred~~ FiVE Hundred each*
> *~~each~~*

The other side reads, at the top,

> *I Want Jim Massey to get my FARM*
>
> *I Want No one church to have*

---

[7] According to James, this is a reference to the "Number One Church."

7

*500/00*

  *I Want Joyce WAShBURN to get or have 500/00*[,]

the bottom reads, upside down,

  <u>*132*</u> *Blood pressure 28 Sun*
  *67*

  28th Sun Blue pants set

  29 greenish bluish Pants Red Swe

  <u>Exhibit 27</u>, which James dated in October 2008, is also two-sided, with the front reading,

   October
  *WED 1st*
  *WEND 1st*
  THUR 2nd NAVY BLUE pants

  *14 Navy Blue pants*
  *15 got flu shot*

  10th

  *9 gray pants*

  6th Black Pants

The back of Exhibit 27 reads, at the top,

  *I want Jim Massey to get have*
  *MY FARM.*

  *I Want No one ChURch to get*
  *$500/00*

  *(I want Joyce Washburn to have $500/00*
  *FiVE Hundred <u>Each</u>)*

while the bottom reads, upside down,

  *I Want No one Church*
  *To get 500/00.*

  *I Want Joyce Washburn to*

8

*Get 500/00 five hundred gos to each one*

*these are my wishes*     pants
     29 greenish Blueish  *Ina*
             Pants

Exhibit 28, which James testified was written in November 2008, was dated

"NOVEMBER" and reads,

*I Want Jim MassEY to get have*
*I Want* ~~No one~~   *MY FARM*
*No one church to have $500/00*
*I Want Joyce Washburn to have*
          *500/00 five*
   *Five*     *hundred*
      *EACh*

Exhibit 29, which James testified was written in November 2008, also dated

"NOVEMBER" across the top, reads,

*I Want Jim Massey to have my farm*

*I Want no one church to have 500.00*
*I Want Joyce Washburn to have 500.00*
     *JOYCE WAShBurn FiVE*
          *Five hundred each*
            *Each*
*3RD Jim Visited ME*
*4th Wilma Visited*
*4.4 Joyce Visited*

*5th 5 Fri Went to Bible study*
*Sat 16th Fines Blanche Visitid*
*7th 7th SUN*

*18*

Exhibit 31, written on a loose-leaf sheet of paper, reads,

*I Want Jim Massey to have My farm*
*I Want no one Church to have 500*
*I Want Joyce Washburn to have 500*
    *Five hundred each my trust*
        *tells the*

9

*1st Jan new year        rest*
*2ND Fern Massey Visited  the Best*

Exhibit 32, which James testified was written in November 2008, was written on a small

piece of torn paper.  It is dated "November 24."  It reads,

> *I Want Jim to have my FA*
> *November 24        M*
> *I want No one church to get*
> *      500./000*
> *I want Joyce Washburn to ge*
> *       get*
> *the rest in lock Box 500./00*
> *Five hundred each*
> *     Love Ina*

On December 9, 2008, Ina wrote a check to Joyce Washburn for $500 and a check to

Number One Church for $500.

Finally, Exhibit 38, which James testified was written in June 2009, consists of a page

inside Exhibit 35, which is another notebook from Ina's house.  It reads,

> *      June*
> *21st Fathers day Joyce*
> *22ND MON 22 Bingo day*
> *22 Jim & Leta went to Spfg to Dr.    Check*
> *23 Went to Beauty Shop Shampo      up*
> *24 Joyce visited*
>
> *25 Jim Massey nephew [xxx xxxx] Cell*
> *      Phone*
> *     [xxx xxxx] home*
> *27 Blanche Visited*
> *Sun 28*
> *30th I Want Jim Massey to have my farm has it*
> *  I have a trust for the rest      Rented*
> *     June*
> *I Want Jim Massey to have the my farm 30th*
> *the rest is in my trust     he has it Rented*
> *22ND Floyd & Lorene Crewse here Visited*
> 8 Red pants Red pants

### *Ina's Oral Statements*

The following oral statements were admitted by the trial court over the objection that they were hearsay and "would violate the rule against using parol or extrinsic evidence to modify the terms of a written instrument." James countered this objection, arguing to the trial court that they were offered only to show Ina's state of mind and her intent. The trial court admitted them for the limited purpose of showing Ina's intent with respect to any writings concerning her trust.

On January 8, 2007, Don took Ina to a doctor's appointment. On the way home, Don asked Ina if there was "anything in particular she'd like to see go with the [F]arm[,]" to which Ina responded that "she'd like to see it stay in the family if possible" and suggested that either Don or James might like to have it, as they both were full-time farmers. Ina went on to say that she wanted someone to "use it and work the [F]arm right, . . . and operate it like [she] and Luther did." Don responded that he was too old to take on such a large debt, and nothing else was said on the subject.

Later that month, Ina's tax preparer, Elaine Cane, went to Ina's home at Ina's request to prepare her 2006 tax return. While there, Ina mentioned to Cane that she wanted James to have the Farm and ultimately wanted the Farm to stay in the family. Cane told Ina "that she needed to see a lawyer and write everything down." Cane further advised Ina to "keep records" in "a tablet, a notebook, or something[.]" Cane again visited Ina in June or July 2007, this time for a social call. Ina again mentioned that she wanted to be sure James got the Farm "because he's the only one of this bunch that gives a damn about me[.]"

During the first half of 2007, James and Tammy were frequently at Ina's home. Tammy was there during Cane's first meeting with Ina in January, while James was present for her second visit. James told Cane that, "along about May or so" of 2007, Ina told him she intended to leave him the Farm.

At some point thereafter, during Ina's final hospitalization, Don told Ina that, if she wanted the Farm to stay in the family, James wanted it. When he suggested that Ina and James "work out a deal to sell it to him[,]" however, Ina responded, "You know I had that fixed."

### *This Lawsuit*

James filed this lawsuit on January 25, 2011. The petition contained six counts, seeking: declaratory judgment that Ina amended the Trust through her oral and written declarations and intended for James to inherit the Farm (Count I); declaratory judgment that Ina amended the Trust through her oral and written declarations and intended to exclude Betty and Gary as beneficiaries under the Trust Agreement (Count II); imposition of a constructive trust upon money Don had previously distributed to Betty and Gary per the terms of the Trust (Count III); recovery of those same funds from Betty and Gary (Count IV); damages against the Trust based on Don's wrongful action in denying James possession of the Farm (Count V); and attorney fees (Count VI).

Dearl died a month later in February 2011, and the trial court granted James' motion to substitute and add Dearl's grandchildren, Shane and Keeli Hurst, as defendants in the lawsuit.

Don, in his capacity as successor trustee under Ina's Trust, thereafter filed a counterclaim and cross-claim against all other parties in the lawsuit seeking a declaration that Ina did not amend her trust as alleged by James in his petition, a determination of the successors in interest to Dearl's share in Ina's trust, and an award of attorney fees.

Following a trial on November 14, 2013, the trial court entered its judgment in favor of James under Count I of his petition and denying him any relief under the remaining counts in his petition. As to Count I, regarding the Farm, the trial court found

> that by clear and convincing evidence that [Ina] did by her oral statements and written memoranda, including Exhibits 12, 20, 24, 26, 27, 28, 29, 31, 32[,] and 38 indicate her intent to amend the [Trust] by directing her trustee to distribute her

12

real estate, consisting of a farm of 246 acres, at [her] death to her nephew James Massey, the Plaintiff, and that, according to sec. 456.6-602 Mo. Rev. Statutes, such manifestations of intent act as an amendment to said trust.

The trial court further ordered "that Defendant [Don] Massey, trustee, make distribution of the aforesaid real property to [James] by Trustee's Deed in accordance with the provisions of the aforesaid trust as amended."  The trial court's judgment also found that Shane and Keeli were the successors in interest to Dearl's interest in Ina's trust and that all parties should bear their own attorney fees.[8]

Shane timely appealed the trial court's judgment as to Count I in James' petition; no other party appealed from the trial court's judgment.

## Discussion

In his second point relied on, Shane contends that the trial court's determination that Ina amended her Trust by "oral statements and written memoranda" is against the weight of the evidence in that there was no evidence that, even if Ina intended for James to have the Farm, she intended for him to have it for free; the trial court ignored several of Ina's notes that would appear to be of equal value to those on which it relied and pointed to there being no amendment of the Trust; the trial court ignored the 2005 formal amendment of the Trust, which left half of her estate, including the Farm, to Dearl and the other half to Lyle's descendants, including James; the trial court relied upon contradictory notes to reach its conclusion, some of which predate and some of which postdate the 2005 formal amendment of the Trust; the trial court's denial of Count II contradicts its granting of Count I; the handwriting on several notes, particularly Exhibit 38, was not established to be that of Ina; and the circumstances surrounding James' claim on the Farm are suspicious.

---

[8] While the trial court's judgment does not expressly mention Don's counterclaim and cross-claim, it addresses and resolves all of the claims and requests for relief made by Don therein.

13

While "[d]isputes over the *terms* of express trusts are common, . . . [d]isputes over whether a settlor intended a particular writing to create or amend a trust . . . are rare." ***Rouner v. Wise***, 446 S.W.3d 242, 253 (Mo. banc 2014).

> This is likely because, when a settlor uses a document to create or amend an express trust, that document usually will contain an unambiguous statement of what the settlor intends the document to be and do. In many instances, one need look no further than the title of the document to find such a statement, e.g., "Trust Agreement," "Declaration of Trust," or "Amendment to Trust."

*Id.* Such is not the case here. Instead, we are presented with a series of unlabeled, sometimes-undated and unsigned, handwritten notes found in various locations following Ina's death that, taken in the aggregate, were held by the trial court to constitute a valid amendment to Ina's trust.[9]

> Section 456.6-602 states, in relevant part,

> 3. The settlor may revoke or amend a revocable trust:

> * * *

> (2) if the terms of the trust do not provide a method, by any other method manifesting clear and convincing evidence of the settlor's intent, including the terms of a later duly probated will or codicil that identify the trust being revoked or the trust terms being amended.

Section 456.6-602.3(2). The trial court concluded in its judgment that Ina's "oral statements and written memoranda" satisfied this section's amendatory requirement as an "other method manifesting clear and convincing evidence of the settlor's intent[.]"

> To recover on the basis of an amendment to an express trust, a party must establish . . . that the settlor had—and intended to exercise—authority to amend the trust. Then, if the alleged amendment purports to alter original trust provisions concerning the beneficiary, the trustee, and/or the instructions regarding trust property, a party relying on that amendment must prove the settlor intended to supplement or replace those terms with the amended ones.

---

[9] While we note that section 456.4-407.2, RSMo Cum.Supp. 2004, provides that "all declarations or creations of trust of any lands, tenements or hereditaments shall be manifested and proved by some writing signed by the party[,]" we also note that Shane did not raise any issue related to this statute in the trial court or in this appeal.

14

*Rouner*, 446 S.W.3d at 251.

The search for the intent of the settlor begins within the "four corners" of any alleged amendment, and must be done "without giving undue importance to any particular word or phrase." *Id.* at 253. While extrinsic evidence regarding the terms of any alleged written amendment can only be considered upon discovery of an ambiguity within the four corners of the document, such evidence can be considered as it pertains to the intent of the settlor to use a particular document to amend an express trust. *Id.* at 258. Ina's oral statements were only admitted into evidence by the trial court for that limited purpose.

Here, James had the burden to prove that Ina had both the authority to amend the terms of her trust by a particular document and that she had the intent for that particular document to amend the trust such that James would be distributed the Farm outright after her death. Failure to demonstrate either factual proposition dooms his claim to the Farm.

### The Challenged Factual Proposition
### *(Houston step one)*

Shane concedes that Ina had authority under the terms of her trust and section 456.6-602.3(2) to amend her trust. Shane, therefore, only challenges the trial court's factual finding that Ina intended to amend her trust by any particular document before it. This proposition, necessary to support the trial court's judgment, however, is not whether Ina formed the general intent for James to have the Farm upon her death, but rather, whether she specifically intended that a particular document immediately act to amend her trust. While the record contains direct evidence of Ina's general intent, it does not contain any direct evidence of her specific intent related to any particular document. The trial court, therefore, had to rely upon circumstantial evidence from which to draw an inference that Ina formed the requisite specific intent with regard to a particular document or documents. While the trial court may have had probative

15

(substantial)[10] evidence before it supporting such an inference, Shane claims that the probative

value (weight) of that evidence[11] does not induce a belief that such an inference is reasonable.

We agree.

### *The Evidence Favorable to the Challenged Proposition*
### *(Houston step two)*

All of the favorable evidence in the record supporting the existence of the challenged

proposition is included in the Factual and Procedural Background section of this opinion, *supra*.

### *The Evidence Contrary to the Challenged Proposition*
### *(Houston step three)*

Because James had the burden of proving the challenged proposition, the respondents

were not required to present any contrary evidence. *See **White v. Dir. of Revenue***, 321 S.W.3d

298, 305 (Mo. banc 2010) ("Generally, the party not having the burden of proof on an issue need

not offer any evidence concerning it."); *see **Pearson***, 367 S.W.3d at 52. If contrary evidence is

adduced, this Court nevertheless "defers to the circuit court's findings of fact when the factual

issues are contested and when the facts as found by the circuit court depend on credibility

determinations."[12] ***Ivie***, 439 S.W.3d at 206. Only "[e]vidence not based on a credibility

---

[10] "Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment. Evidence has probative force if it has any tendency to make a material fact more or less likely." ***Ivie***, 439 S.W.3d at 199-200 (internal citations omitted).

[11] "'[W]eight of the evidence' denotes an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact. *See **White v. Dir. of Revenue***, 321 S.W.3d 298, 309 (Mo. banc 2010) (stating that 'weight' denotes probative value, not the quantity of the evidence)." ***Ivie***, 439 S.W.3d at 206.

[12]
> A factual issue is contested if disputed in any manner, including by contesting the evidence presented to prove that fact. As enunciated in *White*, a party can contest the evidence in many ways, such as by putting forth contrary evidence, cross-examining a witness, challenging the credibility of a witness, pointing out inconsistencies in evidence, or arguing the meaning of the evidence. Once contested, a trial court is free to disbelieve any, all, or none of the evidence, and the appellate court's role is not to re-evaluate testimony through its own perspective. The trial court receives deference on factual issues because it is in a better position not only to judge the credibility of the witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record.

determination, contrary to the circuit court's judgment, can be considered in an appellate court's review of an against-the-weight-of-the-evidence challenge." ***Id.***

In addition to the manner in which Ina had twice previously formally amended her trust, the following uncontested evidence is contrary to the judgment.[13]

- It was customary throughout her life for Ina to make notes and write things down in various notebooks that she kept around her home. Her usual notes ranged from a grocery list to what she wore on a particular day to reminders of birthdays. She also would occasionally write rough drafts of letters, which she would later rewrite and send.

- During her January 2007 visit, Ina's income tax preparer Elaine Cane advised Ina "that she needed to see a lawyer and write everything down" if James was to get the Farm. At the time of Cane's second visit in Ina's home in June or July of 2007, Ina was upset with Gary and Betty and "did not want them to benefit at all in any way." Cane asked Ina if

---

***Pearson***, 367 S.W.3d at 44 (internal quotation marks and citations omitted).

[13] In his brief, Shane additionally relies on witness testimony other than that of Elaine Cane, some of which is uncontroverted, as evidence contrary to the judgment, but he fails to demonstrate how this testimony was uncontested.

> [T]he trier of fact has the right to disbelieve evidence, even when it is not contradicted. When the facts of the case are contested, this Court defers to the trial court's assessment of the evidence. It is only when the evidence is uncontested that no deference is due to the trial court's findings.

***White***, 321 S.W.3d at 307 (internal quotation marks and citations omitted).

> Evidence is uncontested in a court-tried civil case when the issue before the trial court involves only stipulated facts and does not involve resolution by the trial court of contested testimony; in that circumstance, the only question before the appellate court is whether the trial court drew the proper legal conclusions from the facts stipulated. Evidence also is uncontested when a party has admitted in its pleadings, by counsel, or through the party's individual testimony the basic facts of other party's case. In such cases, the issue is legal, and there is no finding of fact to which to defer.

***Id.*** at 308.

In the absence of Shane's demonstration that this witness testimony was an uncontested fact, we defer to the trial court's credibility determination and omit such testimony from our recitation and analysis of the evidence contrary to the judgment.

she had followed Cane's previous advice and written anything down. Ina showed Cane a page in a red spiral notebook. Although Cane could not recall the words Ina had written in that notebook, she recalled telling Ina that she did not think that "was good enough[.]"

- Some of Ina's notes included statements in her handwriting purporting to exclude Gary and Betty as beneficiaries of her will and trust. Under Count II of James' petition, the trial court found that Ina did not intend for these notes to amend her trust.

    o Exhibit 13 is an undated note to Dearl. James said that Ina gave it to him "to keep" but also said that it was found in Ina's bible. It reads:

    > Dearl please – I want Gary and Betty left out of my Estate They havent helped me in any way – when I really needed help. We may just haft to do away with my Will & Trust the way things are going right now. I want you to have it.

    By "you," James said, the note is "addressed to Dearl." He did not know why Ina gave it to him. He did not give it to Dearl, who to his knowledge never knew that it existed.

    o Exhibit 16 is a page inside a larger exhibit, Exhibit 1, which was one of Ina's little notebooks that also served as her telephone book. James said that he had seen it in her home. It reads:

    > April 7 2007
    >
    > Dearl – Please don't let Gary or Betty get any part of my Estate they have not helped to take care of me in any way and I have really needed help I want you to have it

    This note, dated April 7, 2007, is dated after the February 28, 2007 letter that was in the family bible. It is specifically addressed to Dearl, but James never delivered it to him.

18

- o Exhibit 18 is a loose page, with the bottom torn away, inside a notebook that is Exhibit 17. James found it in Ina's house. In pertinent part, it states:

  > Dearl & Don Please take Betty & Gary off[/]out of my Will don't
  > let them have any of my Estate April 10 07 they have not helped
  > me in any way I had to have help, they seemed to twin against me

  The note is dated April 10, 2007, in the first sentence. The note also has other miscellaneous notations and dates on it related to other matters.

- o Exhibit 22 appears on a page in a small book admitted as Exhibit 21. It is dated April 11, 2007, the day after Exhibit 18. It reads:

  > Dear Dearl and Don please take Betty and Gary out of my will
  > They have not helped in any way to help take care of me April 11
  > – 07

- o In deciding against James on count two of his petition, the trial court found that there was not clear and convincing evidence that Ina amended her trust by these writings to disinherit Gary and Betty. It found that "said memoranda were written in a short space of time, a few days in 2007, and never repeated or referred to in writing or orally corroborated to any other person thereafter until after the date of her death some years later."

- According to James, he took Ina's notebooks from her house to his, where neither Dearl nor Don would have had access to them. These notebooks included all of the notes mentioned herein except those found by Don in the family bible. "

- James testified that he talked with a realtor about land values in the area because, he said, "I felt like I ought to know kind of what stuff—what the thing was worth until we made up our mind about the stuff." He talked with two of his sisters, who said "that, you know, if that's what Aunt Ina wanted, they was good with it." So James "began to be about seeking legal counsel" but said that he did not talk to a lawyer while Don was talking

19

with him about buying the farm. While James testified he made no purchase offer and did not apply for a loan with which to buy the farm, he admitted that he told Don that he intended to obtain financing from Bank of America.

### *Why the Favorable Evidence Fails to Induce Belief in the Challenged Proposition (Houston Step Four)*

In its judgment, the trial court expressly relied upon Ina's "oral statements and written memoranda, including Exhibits 12, 20, 24, 26, 27, 28, 29, 31, 32[,] and 38" in drawing the inference that Ina intended by her writings to amend her trust to give the Farm to James—the challenged proposition. If the probative value (weight) of the favorable evidence induces belief that this is a *reasonable* inference, then the judgment is not against the weight of the evidence. *See Ivie*, 439 S.W.3d at 206 ("When the evidence poses two *reasonable* but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence.") (emphasis added); *Houston*, 317 S.W.3d at 187 (stating that against-the-weight-of-the-evidence analysis must consider *reasonable* inferences drawn from the favorable evidence). Conversely, even though the inference may be supported by probative (substantial) evidence, if the probative value (weight) of that favorable evidence does not induce belief that this is a *reasonable* inference, then the judgment is against the weight of the evidence. *See Ivie*, 439 S.W.3d at 206 ("A circuit court's judgment is against the weight of the evidence only if the circuit court could not have *reasonably* found, from the record at trial, the existence of a fact that is necessary to sustain the judgment.") (emphasis added). Our Supreme Court has recently addressed this issue.

In *Rouner*, 446 S.W.3d 242, a letter signed by the settlor and his wife was found following the settlor's death. It had been written years earlier in anticipation of a long-distance trip and specifically set out what he and his wife wanted to have happen with their property should they meet with their demise. The letter referenced a previously executed trust that had

20

not been updated for some time, and the terms of the letter differed greatly from those in the original trust agreement. The letter also purported to dispose of property in addition to the property already included in the trust. Upon the settlor's death, the settlor's step-children, who were not listed as beneficiaries of the original trust but were included as beneficiaries under the terms of the letter, sought a judgment declaring the letter an amendment to the trust and enforcing its terms.

Although the letter very specifically delineated how the settlor wanted his assets divided and disposed of, and even referenced the original trust agreement, our Supreme Court held that the letter did not constitute an amendment to the original trust because the step-children failed to prove that the settlor intended the letter to amend his trust. *Id.* at 259. In its opinion, that Court found, first, great significance in the absence of the word "amend" or any equivalent term, e.g., "alter," "add," or "change," in the letter. *Id.* at 254. While the Court noted that "there are no 'magic words' that a settlor must invoke to create or amend a trust[,]" it also found it *unreasonable* to infer an intent to amend where a settlor "failed to use the word 'amend' (or any reasonably synonymous term) in describing the changes he intended" to effect. *Id.* (Emphasis added).

There is a similar absence in relevant language here. None of Ina's handwritten notes include the words "amend," "alter," "add," "change," or their equivalent. None of the notes are in any way titled as an amendment, or even titled in general; they are, instead, single statements on various pages of notebook paper, generally in the midst of completely unrelated statements and one as an apparent add-on to a family letter. Ina's oral statements similarly lack any such language. The absence of such language in her notes and oral statements strongly suggests and

21

supports that an inference drawn from those notes and statements that she intended for the notes to amend her trust is not a reasonable inference. *See id.*

The ***Rouner*** Court further noted the letter's "wholesale departure" from the terms of the original trust agreement. *Id.* at 255. Whereas the original trust specified that the beneficiaries would, instead of specific property, receive "interest from shares plus discretionary distributions for 'health, maintenance, support, and education[,]'" and the principal remain in the trust to be distributed to the beneficiaries' descendants, the letter distributed specific property to beneficiaries upon his death. *Id.* While the Court noted the settlor's authority, as trustee, to make such a change to the original terms, it also noted that, "surely, he would have given some indication if that is what he intended the 2002 Letter to require." *Id.*

Similarly, here, the terms in Ina's handwritten notes differ significantly from those in the original Trust Agreement and its formal amendments. While the Trust gave a half-share of Ina's entire estate—including the Farm—to each of her younger brothers or their descendants, the handwritten notes, if read as James asks, remove a significant portion of that estate from the shares of his siblings and cousins while increasing his share from one-fifth of one-half to the entirety of the Farm. Beyond reducing considerably the shares of his brothers and sisters, the notes and statements completely ignore the one-half share in the Farm awarded to Dearl and his descendants. In the words of ***Rouner*** as applied to Ina, "[s]urely [s]he was entitled to make such a change but, just as surely, [s]he would have given some indication if that is what [s]he intended" in her handwritten notes. *See id.*

Finally, the Court in ***Rouner*** emphasized the difference between the mandatory language in the original trust agreement, e.g., the repeated use of "shall," and the solicitous language used in the letter, e.g., the repeated use of "wish" and "want." *Id.* at 256.

> Historically, Missouri courts have been hesitant to find an intention to create a trust when the settlor uses such precatory language. ***Estill v. Ballew***, 26 S.W.2d 778, 780 (Mo. 1930) (noting that "there are many cases in which the courts, considering that it did not appear that the testator intended to make them imperative, have held that no trust was created by the use of such precatory words as 'wish,' 'will,' 'will and desire,' 'request,' etc.").

***Rouner***, 446 S.W.3d at 256.

Likewise, here, while the Trust Agreement and Ina's two prior formal amendments repeatedly use the word "shall" to direct the trustee to distribute the shares of Ina's estate, including the Farm, among her several beneficiaries, Ina's informal writings relied upon by the trial court use only the words "want" and "wishes" in relation to James receiving the Farm. Rather than a legally binding imperative, such notes and statements serve merely to advise her heirs as to how she would like her property to be disposed, and only vaguely so at that. *See **id.*** at 256-57. Even James conceded at trial that such terms were unclear and indefinite as to whether he was to inherit or have first right of purchase of the Farm.

Also, as in ***Rouner***, extrinsic evidence, by way of Ina's oral statements, was admitted by the trial court "to establish whether the settlor actually intended a particular writing to be a trust document." *See **Rouner***, 446 S.W.3d at 258. None of Ina's oral statements, however, made any direct reference to any of her handwritten notes and drawing any inference of such a reference would be sheer speculation. Applying ***Rouner***'s language to the facts here, "[n]o matter how credible the trial court may have found this extrinsic evidence to be, and no matter how much weight the trial court may have given it, it simply does not establish (alone or in conjunction with the language of [Ina's handwritten notes]) that [Ina] understood and intended for [any one or more of her handwritten notes] to serve as an amendment to [her] [t]rust." ***Id.*** at 259.

The contrary evidence here provides three indicators that the probative value of the favorable evidence supporting an inference of intent is weaker than the supporting evidence in

23

***Rouner***, which was held as a matter of law in affirming the trial court's judgment not to give rise to a reasonable inference of an intent to amend a trust by a particular document. ***Id.*** at 254 . First, Ina used an attorney to draft the Trust Agreement and had twice before used an attorney to formally amend the Trust Agreement; such actions indicate an understanding of estate planning, which, under ***Rouner***, also points to a lack of intent to amend by handwritten notes. ***Id.*** at 257. Ina's tax preparer Elaine Cane reminded Ina that if she wanted James to have the Farm, "she needed to see a lawyer and write everything down[,]" and that Cane did not think that writing things down in her notebook "was good enough." Moreover, both of the previous amendments to the Trust had been filed with the Texas County Recorder's Office as mentioned and provided in Section I of the Trust Agreement; none of Ina's handwritten notes had been so filed.

Second, the informal and informational nature and manner in which Ina took and kept her personal notes undermines the reasonableness of an inference she intended to take affirmative action to amend her trust by virtue of any or all of those notes. Our review of all of Ina's handwritten notes admitted into evidence reveals that they were primarily a record of historical events that occurred in her life on any particular day, such as what she wore, when she took a bath or who had a birthday. It was uncontested that a secondary function of some of her handwritten notes was to serve as rough drafts for letters that she might later formally write and possibly send. Both of these functions seriously diminish the probative value of these notes in inducing any reasonable belief that she intended for any or all of these notes to affirmatively operate as an amendment to her Trust. Indeed, the trial court came to that very conclusion in rejecting James' claim in Count II that Ina's handwritten notes amended her trust to exclude Gary and Betty as beneficiaries.

24

Third, James' actions related to the existence of Ina's handwritten notes seriously diminishes the probative value of those notes. James removed almost all of Ina's handwritten notes from her home without disclosing their existence to Don, the trustee of Ina's trust, before filing this lawsuit. Such concealment by James at the same time that Don was talking to him about buying the Farm coupled with James telling Don that he intended to obtain financing from Bank of America further reduces the probative value of the notes James revealed in the subsequent litigation.

There's an additional reason, not present in **Rouner,** the probative value of the favorable evidence fails to induce a belief that the trial court's inference of Ina's intent to amend her Trust by her handwritten notes is reasonable. In **Rouner**, there was one particular document that was claimed to amend the settlor's trust at a particular ascertainable time—when it was signed by the settlor. Here, however, James does not claim, nor did the trial court find, that Ina intended for any particular handwritten note to operate to amend her Trust. Indeed, there is no evidence supporting that Ina intended any particular handwritten note to amend her Trust. Rather, James claimed and the trial court found that Ina intended to amend her Trust by the totality of a series of similarly worded notes made over more than a two-year period. Yet, there is no evidence as to how many handwritten notes Ina intended for it to take to amend her Trust or of a particular time or event by which she intended that the accumulation of notes would amend her Trust. In the absence of such evidence, the probative value of an arbitrarily selected number of notes written over an arbitrarily selected period does not induce a belief that the trial court could reasonably infer that Ina intended for that number of notes within that time period to operate to amend the Trust.

In conclusion, there is no direct evidence that Ina intended for any or all of her handwritten notes to amend her Trust. Rather, the trial court drew an inference from the evidence that Ina intended for the totality of her handwritten notes to amend her Trust. While that inference may be supported by probative (substantial) evidence, we determine for the above and foregoing reasons that in this rare case the probative value (weight) of that evidence does not induce a belief that such an inference is reasonable. A judgment premised upon an unreasonable inference is against the weight of the evidence and supports our firm belief that the judgment is wrong. *See Ivie*, 439 S.W.3d at 205-06. Shane's second point relied on is granted.

## Decision

The trial court's judgment is reversed, and the cause remanded for further proceedings consistent with this opinion.


GARY W. LYNCH, J. – Opinion author

MARY W. SHEFFIELD, P.J. – concurs

NANCY STEFFEN RAHMEYER, J. – concurs