Betty HOUSTON, Wayne Keathley, Leslie Marsden, Monica Keathley, Judy Payne, Janet McDowell, Dennis Smith, and Gary McDowell, Plaintiffs–Respondents,

v.

Sherry L. CRIDER and John L. Crider, Defendants–Appellants.

No. SD 29879.

Missouri Court of Appeals, Southern District, Division Two.

July 20, 2010.

John M. Albright and Daniel T. Moore, Moore, Walsh & Albright, L.L.P., Poplar Bluff, MO, for Appellants.

Matthew B. Lee and James E. Spain, Spain, Miller & Spain, L.L.C., Poplar Bluff, MO, for Respondents.

GARY W. LYNCH, Presiding Judge.

Sherry L. Crider and John L. Crider, (individually "Sherry" and "John" and collectively "Defendants")[1] appeal the trial court's judgment setting aside a deed dated September 22, 2003, from Irene Norried conveying to Sherry a house and lot ("property") owned by Irene in Van Buren, Missouri.[2] Finding no merit in either of Defendants' claims of trial court error, we affirm.

### Factual and Procedural Background

The property was originally owned by Ben Keathley. With his first wife, Ben had a son, Harrison Keathley. Harrison had two children, Jo Ann and David Keathley. Ben and his second wife, Lelah, had five children—Edda Mae, Wayne, Billie, Ervin, and Betty—who are now all deceased. Their children, Ben and Lelah's grandchildren, are the plaintiffs in this action. After Lelah's death, Ben married Lelah's niece, Inez Hughes. Inez was the sister of Irene Norried.

Inez acquired the property upon Ben's death. Thereafter, she conveyed the property to herself and Irene as joint tenants with right of survivorship. Upon Inez's death, Irene became the sole owner of the property. On September 1, 2000, Irene executed a beneficiary deed naming Wayne Keathley, Ervin Keathley, Betty Houston, Joan Copper, David Keathley, Gary McDowell, Judy Payne, Janet McDowell, Dennis Smith, Penny Carson, and Kent Smith—all of Ben's lineal descendants—as beneficiaries of the property upon her death. Irene died on July 1, 2005, at the age of 94.

Sherry was not related to Irene by blood or marriage. Her relationship with Irene began in 1996, before Inez died, when David Keathley, Sherry's then-boss, asked her to start taking Irene's mail to her. Over time, Sherry began doing additional things for Irene, such as taking her to the doctor or bank, filling out her checks for bills, and other general chores. Irene was dependent on other people to get her around or bring her things, as she did not drive and had to use a walker for ambulation. As Sherry's relationship with Irene grew, Irene became more distant and reclusive from family members and friends.

In the last four years of her life, Irene began to physically and mentally deteriorate. During this time, Sherry observed that Irene's arthritis was bothering her more and more. In addition, according to Sherry, Irene was losing weight, getting

---

1. Because some family members share the same last name, we use first names for clarity. No disrespect or familiarity is intended. Also for clarity, we refer to the respective parties as referenced in the trial court: Plaintiffs and Defendants.

2. The trial court's judgment also set aside a subsequent deed to the property dated July 5, 2005, from Sherry and John to themselves as husband and wife. Because the validity of this deed is dependent upon the validity of the first deed from Irene to Sherry, the parties in their briefs and this Court in this opinion have limited the discussion solely to the validity of the first deed.

weaker, tiring more quickly, and had blurred vision, joint pain, back pain, and muscle weakness. Friends and members of Irene's family began to notice that she appeared confused, was unable to recognize people she had known for years, and exhibited paranoia. Starting somewhere around 2001, family members who had known Irene for years observed that Irene did not recognize them. Irene began complaining about members of her family throwing sewage on her house and about the smell created by the sewage. None of her family or friends ever observed any sewage or its smell at her house.

David Keathley—Ben's grandson—and his wife, Joyce, lived next door to Irene. Joyce visited Irene several times a week. During the summer of 2001, Joyce noticed that Irene was becoming confused, more distant from Joyce, and paranoid that family members were trying to kill her. Joyce testified that in 2001, Irene was not able to write checks for herself and, when she signed checks placed in front of her, she was oblivious as to their amount or purpose. That same year, Joyce started hearing complaints from Irene about a smell in her house. Irene complained to her that someone had dug up dead bodies in her yard. Joyce never smelled the odor Irene described to her or saw any dead bodies. According to Joyce, once Irene started to deteriorate mentally, it went fast. Joyce testified that Irene's vision also began to fail sometime around 2001. Her vision problems were so bad that it forced Irene to stop taking her usual walks because she might fall.

Starting around 2000 or 2001, Joyce began noticing that Sherry was over at Irene's house with much more frequency than in the past. Joyce testified that as Sherry's relationship with Irene grew, Irene's relationship with the rest of the family cooled. Joyce did not know why Sherry was paying so much attention to Irene, but it gave her cause for concern.

David, a licensed attorney, testified that from the year 2000 until her death, he saw Irene almost every day. Beginning in 2001 and thereafter, David noticed that Irene was having hallucinations and that she was vulnerable and paranoid. On numerous occasions, Irene spoke to David of her fear of being kicked out of the home, and did not understand that she owned the home. Irene's actions concerned David enough that, although he wanted to buy Irene's house and grant her a life estate to allay her fears, he would not do it without the approval of all members of the family because he believed that Irene was not competent to dispose of her property. David never saw any improvement in Irene's mental or physical faculties after 2001, but rather, he observed her continual deterioration.

According to David, Sherry started focusing attention on Irene after Inez died. David noticed that the closer Sherry became with Irene, the more strained Irene's relationships became with family members. He testified that, starting in 2002, Irene eventually became convinced that her family was trying to kill her. At one point after Sherry was going to Irene's house more and more often, David informed Sherry she did not have to do so much for Irene. Sherry responded to him, "It will be worth my time."

On April 11, 2002, Sherry drove Irene to First Midwest State Bank, where Irene banked. A letter, typed by someone other than Irene but signed by her, was given to the bank requesting it to release to Sherry any and all information regarding Irene's accounts, safety deposit box, and certificates of deposit. Four days later, at least three of Irene's certificates of deposit were made payable on death to Sherry. Before this change, Sherry had no actual or po-

tential interest in any of Irene's assets. In November 2002, Sherry's name was added to Irene's checking account. On November 20, 2002, Sherry's name was added to Irene's safety deposit box at the bank. After Sherry was granted such authority, no one other than Sherry ever accessed Irene's safety deposit box again.

Irene signed a durable power of attorney on December 9, 2002, naming Sherry as her attorney-in-fact. This she did after Sherry called an attorney to set up an appointment for Irene and drove her to the attorney's office. Also, starting in December 2002, Irene began periodically signing checks to Sherry in varying amounts, the largest of which was $2,300.00. On May 22, 2003, Irene executed a will leaving all of her property, regardless of its nature or location, to Sherry.

On September 22, 2003, by general warranty deed, Irene deeded the property to Sherry. Sherry drove Irene to the attorney's office to execute this deed. Thus, between April 2002 and September 2003, Irene had named Sherry as the beneficiary of almost all of her property. Irene died on July 1, 2005, leaving Sherry $39,292.60 in certificates of deposit, $43,000.00 in a checking account, and the property.

After Irene's death, Plaintiffs instituted this action to set aside the September 22, 2003, deed to the property from Irene to Sherry, claiming that it was procured by Sherry's exertion of undue influence over Irene. Following a bench trial, the trial court entered judgment setting aside the deed. This appeal followed.

### Standard of Review [3]

■ On appeal of an equitable action to set aside a deed, the trial court's judgment will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Landers v. Sgouros*, 224 S.W.3d 651, 655 (Mo.App.2007). "When reviewing a court-tried case, we view all evidence and inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences." *Id.* (quoting *Ortmann v. Dace Homes, Inc.*, 86 S.W.3d 86, 88 (Mo.App.2002)). "We defer to the trial court's determinations as to the credibility of witnesses." *Id.*

### Discussion

■ Defendants raise two points on appeal. Both are governed by the following principles.

"A deed procured by the exercise of undue influence is rendered invalid." *Pike v. Pike*, 609 S.W.2d 397, 402 (Mo. banc 1980). "The test is whether the grantor's free agency and voluntary action were thwarted." *Id.* "While neither direct testimony nor overt acts operating at the moment of the instrument's execution need be shown, the facts and circumstances from which undue influence can be inferred must be proved by clear, cogent and convincing evidence." [ ] *Id.* at 402–03 (internal citations omitted); *see Lee v. Hiler*, 141 S.W.3d 517, 523 (Mo.App.2004).

"The cases recognize that undue influence is seldom susceptible of direct proof and that generally it must be deduced from the circumstances of the particular case." *Reeves v. Boone*, 591 S.W.2d 118, 121 (Mo.App.1979). "It is necessary that the undue influence be operative at the time of execution of the

---

**3.** The preceding factual background was prepared in accordance with this standard of review.

deed sought to be set aside." *Robertson,* 15 S.W.3d at 413.

*Landers,* 224 S.W.3d at 660. The existence of one particular circumstantial scenario has been recognized as raising a presumption of undue influence in procuring the execution of a deed. *Duvall v. Brenizer,* 818 S.W.2d 332, 335 (Mo.App. 1991). "The 'presumption' is raised when there is a confidential relationship, a deed favoring the one acting in the fiduciary capacity, and some evidence 'from which the Court can infer undue influence[.]'" *Id.* (quoting *Davis v. Pitti,* 472 S.W.2d 382, 387–89 (Mo.1971)). Substantial evidence supporting all three prongs of the presumption, even in the face of contrary evidence tending to rebut the presumption, is sufficient to support a judgment that a deed was the product of undue influence. *Id.*

*Trial Court did not rely upon and, thus, misapply section 461.054*[4]

Defendants assert in their first point that the trial court misapplied the law by relying upon section 461.054,[5] related to procuring a beneficiary designation by undue influence, to reach its legal conclusion that Sherry exerted undue influence upon Irene to procure the execution of the deed in her favor. While section 461.054 is not mentioned in the trial court's judgment, Defendants argue, nevertheless, that the trial court relied upon that statute in reaching its conclusion because the three cases cited by the trial court in its judgment are "actions brought pursuant to

Chapter 461" and are, thus, "inappropriate precedence." Defendants' point has no merit.

In its judgment, the trial court cited to *In re Estate of Goldschmidt,* 215 S.W.3d 215, 221 (Mo.App.2006), for the proposition that "a presumption of undue influence arises where there is substantial evidence showing (1) a confidential and fiduciary relationship, (2) that the fiduciary obtained a benefit, and (3) some additional evidence from which there is an inference of undue influence." While Defendants are correct that *Goldschmidt* was an action under section 461.054, the three prongs of the undue-influence presumption articulated by the Court in that case, and relied upon by the trial court in its judgment here, are substantively identical to the three prongs of the undue-influence presumption in an equitable action to set aside a deed due to undue influence, as previously discussed. *Duvall,* 818 S.W.2d at 335; *Davis,* 472 S.W.2d at 387–89. In applying the undue-influence presumption, the trial court explicitly found that Defendants conceded the first two prongs of the presumption—that a confidential and fiduciary relationship existed between Irene and Sherry and that Sherry obtained a benefit from that relationship, i.e., the deed in her favor. Neither of these findings is challenged by Defendants in this appeal.

The trial court next turned to the third prong of the presumption as the only issue in dispute—"whether there is substantial evidence from which there is an inference of undue influence." In its

4. All statutory references are to RSMo 2000.

5. Section 461.054 provides, in pertinent part:
   1. A beneficiary designation or a revocation of a beneficiary designation that is procured by fraud, duress or undue influence is void.
   * * * *
   3. On petition of any interested person or the transferring entity, the trier of fact shall determine whether a beneficiary designation or a revocation of a beneficiary designation is void by reason of subsection 1 of this section. . . . The trier of fact may mitigate the effect of subsection 1 or 2 on any person as the trier of fact determines justice requires. Any party may demand a jury trial.

judgment, the trial court quoted from *Duerbusch v. Karas*, 267 S.W.3d 700, 708 (Mo.App.2008), and *In the Estate of Gross*, 840 S.W.2d 253, 257 (Mo.App.1992), that "undue influence is often proved by circumstantial evidence" and "persons exerting undue influence will do so in as subtle, furtive, indirect and elusive a manner as possible and such influence may therefore be shown indirectly by the reasonable and natural inferences drawn from the facts and circumstances proved." As previously discussed in the general principles governing this case, the former proposition has been explicitly applied in suits in equity to set aside a deed due to undue influence. *Landers*, 224 S.W.3d at 660; *see also Davis*, 472 S.W.2d at 387. The latter concept—that the concealed nature of acts of undue influence can give rise to reliance upon reasonable inferences drawn from the surrounding circumstances to find undue influence—has been utilized in the context of an equitable action to set aside a deed for undue influence. *See Davis*, 472 S.W.2d at 387. Other than the bare assertion that *Duerbusch* and *In re Gross* were Chapter 461 actions,[6] Defendants make no argument that the underlying propositions articulated by the trial court do not apply to the facts in this case or should not have been relied upon by the trial court in entering its judgment in this case.

■■ Defendants have failed to direct us to, or otherwise argue that, any specific legal conclusion supported by the trial court in its judgment by citation to *Goldschmidt*, *Duerbusch*, or *In re Gross*, has no application to this action or is otherwise in any way a misapplication of the law concerning a determination of undue influence in a suit in equity to set aside a deed.[7] Defendants' first point is denied.

*Defendants fail to demonstrate that the judgment is not supported by substantial evidence or is against the weight of the evidence*

In their second point, Defendants assert that the trial court's judgment setting aside the deed as a product of Sherry's undue influence upon Irene is not supported by substantial evidence and is against the weight of the evidence. This is so, Defendants argue, because

[Irene] gave all of her property to the people who assisted her during her lifetime, the medical records showed no sign of mental infirmity, those claiming mental infirmity never sought a guardianship, nor did they try to set aside the deed during the grantor's lifetime and, rather than giving weight to the grant-

---

**6.** We note that Defendants are incorrect in their characterization of *In re Estate of Gross* as a Chapter 461 action. It was a discovery-of-assets proceeding under section 473.340, seeking to recover personal property held by decedent and the defendant as joint tenants. *In re Estate of Gross*, 840 S.W.2d at 255.

**7.** Defendants argue in their point and in the relevant argument portion of their brief that the trial court failed to make findings of fact or conclusions of law on a number of issues other than those which the trial court supported by citation to one of these three cases. Defendants made no request for such findings of fact or conclusions of law, as provided by Rule 73.01(c). In the absence of such a request, a trial court does not err in failing to make findings of fact or conclusions of law. *Hammons v. Ehney*, 924 S.W.2d 843, 850 (Mo. banc 1996). Moreover, Defendants did not raise such claimed omissions in a timely motion to amend the judgment, pursuant to Rule 78.07(c). Thus, Defendants have waived and failed to preserve for appellate review any allegations of error related to the language of the judgment or any required findings. Rule 78.07(c); *Stuart v. Ford*, 292 S.W.3d 508, 517 (Mo.App.2009).

All rule references are to Missouri Court Rules (2009).

or's independent advice of counsel in the preparation of the deed, the trial court sought to infer undue influence based on the Appellant driving the grantor to the lawyer.

We begin our analysis of this point noting that "[t]he trial court's judgment is presumed valid and the burden is on the appellant to demonstrate its incorrectness." *Bowles v. All Counties Inv. Corp.,* 46 S.W.3d 636, 638 (Mo.App.2001) (quoting *Schaefer v. Rivers,* 965 S.W.2d 954, 956 (Mo.App.1998)).

"Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact[ ] can reasonably decide the case." *Williams v. Daus,* 114 S.W.3d 351, 359 (Mo.App.2003) (internal citations and quotations omitted). We view the evidence and the reasonable inferences drawn from the evidence in the light most favorable to the judgment, disregard all evidence and inferences contrary to the judgment, and defer to the trial court's superior position to make credibility determinations. *Landers,* 224 S.W.3d at 655. Due to that superior position, " 'a trial court is free to believe or disbelieve all, part, or none of the testimony of any witness.' " *Lueckenotte v. Lueckenotte,* 34 S.W.3d 387, 394 (Mo. banc 2001) (quoting *Burkhart v. Burkhart,* 876 S.W.2d 675, 678 (Mo.App. 1994)). Thus, any citation to or reliance upon evidence and inferences contrary to the judgment is irrelevant and immaterial to an appellant's point and argument challenging a factual proposition necessary to sustain the judgment as being not supported by substantial evidence. Such contrary facts and inferences provide no assistance to this Court in determining whether the evidence and inferences favorable to the challenged proposition have probative force upon it, and are, therefore, evidence from which the trier of fact can reasonably decide that the proposition is true. See *Williams,* 114 S.W.3d at 359.

On the other hand, "[w]eight of the evidence refers to weight in probative value, not quantity or the amount of evidence. The weight of evidence is not determined by mathematics, but on its effect in inducing belief." *Gifford v. Geosling,* 951 S.W.2d 641, 643 (Mo.App.1997) (quoting *Silver Dollar City v. Kitsmiller Constr., Inc.,* 931 S.W.2d 909, 918 n. 18 (Mo.App.1996)). Thus, an against-the-weight-of-the-evidence challenge presupposes the threshold issue of the existence of substantial evidence supporting a proposition necessary to sustain a judgment, but, nevertheless, challenges the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact. Although consideration of probative value necessarily involves some consideration of evidence contrary to the judgment, we nevertheless "defer to the trial court as the finder of fact in our determination as to whether . . . that judgment is against the weight of the evidence." *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht,* 25 S.W.3d 530, 536 (Mo. App.2000) (quoting *Venture Stores, Inc. v. Pacific Beach Co., Inc.,* 980 S.W.2d 176, 180 (Mo.App.1998)). Accordingly, where the resolution of conflicting testimony is required to determine the merits of an against-the-weight-of-the-evidence argument, we defer to the trial court's credibility determinations in the same manner as in the resolution of a not-supported-by-substantial-evidence argument. *Lueckenotte,* 34 S.W.3d at 394. A court will set aside a judgment as "against the weight of the evidence" only when it has a "firm belief that the judgment is wrong." *Gifford,* 951 S.W.2d at 643.

From the above, a distinct analytical framework emerges for each type of

challenge to the evidentiary basis of a judgment.[8] A not-supported-by-substantial-evidence challenge requires completion of three sequential steps:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition; and,

(3) demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.

■ On the other hand, an against-the-weight-of-the-evidence challenge requires completion of four sequential steps:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,

(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

■ It is within this framework that we now turn to discuss Defendants' second point. In that point, Defendants challenge the proposition, as found in the trial court's judgment, that Sherry exerted undue influence over Irene to obtain the deed. Defendants challenge this proposition as being both not supported by substantial evidence and against the weight of the evidence.[9] Defendants' identification of this proposition satisfies the first step of each challenge. Similarly, Defendants have extensively and thoroughly set out the evidence in the record contrary to this proposition, which, while not related or relevant to their not-supported-by-substantial-evidence challenge, satisfies the third step of their against-the-weight-of-the-evidence challenge. Defendants, however, trip on the second step of each challenge—identification of the evidence in the

8. A challenge to the admissibility of evidence is a third type of challenge to the evidentiary basis of a judgment, but no such challenge is raised in this appeal. We note, however, that admissibility challenges must be resolved first in order to determine the universe of evidence from which to decide whether a proposition necessary to sustain a judgment is not supported by substantial evidence or is against the weight of the evidence. We also note that an admissibility-of-evidence challenge may not be raised "under the guise of a sufficiency of evidence argument." *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993).

9. Because each challenge requires differing views of the evidence and how that evidence relates to the evidentiary support for the challenged proposition, best practice would dictate that each challenge should be asserted in separate points relied on. Separating the two challenges in this manner assists an appellant in presenting a clear, cogent, and concise argument for each relying only upon the view of the evidence relevant to that particular challenge. It would also eliminate the natural tendency, which we observe on a regular basis when these challenges are combined in one point, to rely upon and argue evidence and inferences contrary to the proposition in attempting to demonstrate that it is not supported by substantial evidence, when such evidence and inferences are only relevant and material to an against-the-weight-of-the-evidence challenge.

record favorable to the judgment—and, thus, doom their ability to satisfy the last step of each challenge.

Defendants cite no facts favorable to the trial court's finding of undue influence in their point relied on and make only minimal references to such evidence in their argument on this point. Those references are scattered throughout Defendants' argument and are limited to the facts that: (1) Sherry drove Irene to her doctor, bank, and attorney's office; (2) Sherry was designated as attorney-in-fact under Irene's durable power of attorney, granted access to Irene's safety deposit box, designated as a payable-on-death beneficiary on several of Irene's certificates of deposit, and added to Irene's checking account; (3) the record includes many years of Irene's checks, Sherry filled out the checks, and many of the checks were payable to Sherry; (4) Irene had strange complaints that her house smelled funny and Sherry laid new carpet in response to those complaints; and, (5) the "case included a claim [that Sherry] said caring for Irene would be worth her time."

In taking this minimalist approach, Defendants fail to identify evidence of Irene's general state of confusion, inability to recognize people she knew, belief that her family members were trying to kill her, belief that sewage was being thrown on her house, belief that dead bodies had been dug up in her yard, or inability to comprehend the amount or purpose of the checks she signed. Similarly, Defendants fail to identify the evidence of Irene's diminishing physical condition during the relevant time period. Likewise, Defendants do not mention any evidence of Irene's growing isolation and emotional distancing from her family, hallucinations, paranoia, and general diminished mental capacity, which occurred during the same time period that Sherry made herself increasingly available to provide for Irene's needs. Nor do they identify the evidence that, in addition to driving Irene to the attorney's office, Sherry made the appointments with the attorney and may have provided the legal description for the deed to the attorney. Defendants also fail to acknowledge the typed letter signed by Irene that was presented to the bank authorizing the release of information to Sherry on all of Irene's accounts at the bank. While there was no direct evidence as to who prepared this letter, its existence and delivery to the bank immediately after Sherry drove Irene there, coupled with Irene's diminished mental capacity, growing isolation from family, and Irene's concomitant dependence upon Sherry within a confidential and fiduciary relationship, gives rise to a reasonable inference that Sherry either prepared the letter or caused it to be prepared.

It follows that Defendants' failure to fully identify and develop the evidence favorable to the finding of undue influence necessarily undermines their ability to demonstrate how that favorable evidence did not have probative force upon the issue of undue influence such that the trier of fact could not reasonably decide its existence—the third and last step necessary to mount a not-supported-by-substantial-evidence challenge. The exclusion of material favorable evidence renders Defendants' attempted demonstration analytically useless and provides no support for sustaining Defendants' challenge.

Similarly, the failure to fully identify all material favorable evidence undermines Defendants' ability to demonstrate why that evidence was so lacking in probative value, when considered in the context of the totality of the evidence, that it failed to induce belief in the existence of undue influence—the fourth and last step necessary to mount an against-the-weight-of-

the-evidence challenge. The omission of material favorable evidence from the weighing process strips Defendants' purported demonstration of any analytical value or persuasiveness.

■ To support a favorable decision for Defendants on this point would require this Court to devise and articulate its own demonstration of how the omitted favorable evidence, either by itself or considered along with the partial favorable evidence included by Defendants in their argument, is not substantial evidence or is lacking in probative value as compared to the totality of the evidence, so as to be against the weight of the evidence. Such action on our part would thrust us into becoming an advocate on Defendants' behalf; a role we are prohibited from assuming. *Boyd v. Boyd,* 134 S.W.3d 820, 824 (Mo.App.2004). Defendants' second point is denied.[10]

### Decision

The trial court's judgment is affirmed.

SCOTT, C.J., and MCGHEE, Sr.J., concur.

10. From our review of the record to determine whether Defendants fully identified all the material favorable evidence in the record supporting a finding of undue influence, leading to our conclusion that they did not, we *ex gratia* note that the trial court's finding of undue influence, based upon the existence of all three prongs of the presumption of undue influence, as discussed under Defendant's first point, is supported by substantial evidence and is not against the weight of the evidence. Inexplicably, Defendants make no mention of this presumption in their brief. Defendants' reliance on *Lape v. Oberman,* 284 S.W.2d 538 (Mo.1955), is misplaced because our Supreme Court found that no confidential or fiduciary relationship existed and, thus, the presumption failed. *Lape,* 284 S.W.2d at 542. Likewise, *Wingate v. Griffin,* 610 S.W.2d 417 (Mo.App.1980), also relied upon by Defendants, is distinguishable in that the trial court in that case found no undue influence, which, unlike the situation presented here, resulted in the evidence on appeal being viewed in the light favorable to that finding. *Wingate,* 610 S.W.2d at 418. The evidence in *Wingate,* viewed in that light, supported a finding that the grantor "freely executed the deed in question." *Id.* at 420.