**Leah E. DAY and Mariah
L. Day, Appellants,**

v.

**Pamela HUPP and Mark
Hupp, Respondents.**

**No. ED 104168**

Missouri Court of Appeals,
Eastern District,
DIVISION FIVE.

Filed: May 16, 2017

Motion for Rehearing and/or Transfer
to Supreme Court Denied June
22, 2017

Motion for Transfer to Supreme Court
Denied October 5, 2017

David T. Butsch, Christopher E. Roberts, 231 S. Bemiston, Suite 260, Clayton, MO 63105, for appellants.

Michael R. Hanson, 225 S. Main, Suite 250, O'Fallon, MO 63366, for respondents.

LAWRENCE E. MOONEY, JUDGE

The plaintiffs, Leah and Mariah Day, appeal the judgment of the Circuit Court of St. Charles County entered in favor of the defendants, Pamela and Mark Hupp, following a bench trial. Our standard of review compels us to defer to the trial court's credibility determinations. These credibility determinations led the trial court to conclude that Pamela Hupp made no enforceable promise to the plaintiffs' late mother and that the plaintiffs failed to carry their burden of proof to establish either constructive fraud or unjust enrichment. Consequently, we must affirm the trial court's judgment.

Factual and Procedural Background

The plaintiffs are sisters Leah and Mariah Day, the only children of the late Betsy Faria. The defendants are Pamela Hupp, a friend of Betsy Faria, and Hupp's husband, Mark Hupp. Late in 2011, Betsy Faria suffered from stage-IV breast cancer, had received a terminal diagnosis, and was undergoing chemotherapy. On December 23, 2011, Betsy Faria changed the beneficiary designation on her State Farm life-insurance policy for $150,000 from her husband, Russell Faria, to Pamela Hupp.[1] Faria was murdered in her home four days later, on December 27, 2011. Leah Day was then 21 years old, and Mariah Day was 17. Faria died intestate.

The Lincoln County Prosecutor charged Faria's husband with her murder, and a jury convicted him in November 2013. Ex-cluded at Russell Faria's criminal trial was evidence that Betsy Faria had named Hupp the beneficiary on her life-insurance policy just four days before her murder. Russell Faria sought to introduce this as evidence that there was an alternate suspect in Betsy Faria's murder.[2] During an offer of proof in the criminal trial, Hupp testified about establishing a trust for the Days. During the pendency of the appeal of Russell Faria's criminal conviction to this Court, he filed a motion to remand for new trial due to newly discovered evidence. The newly discovered evidence consisted of Hupp's 2014 deposition testimony in this case that contradicted her testimony at Russell Faria's criminal trial about Betsy Faria's plans for the life-insurance proceeds and the reasons that Hupp established a trust for the Days. This Court granted Russell Faria's motion for remand.[3] On remand, Russell Faria was granted a new trial, and was acquitted of his wife's murder in November 2015.

In the meantime, the Day sisters sued Pamela and Mark Hupp for the proceeds of their mother's $150,000 State Farm life-insurance policy, alleging constructive fraud and unjust enrichment. The Days asserted that Faria changed the beneficiary on her life-insurance policy to Pamela Hupp in reliance on Hupp's promise and resulting agreement with Faria to use the insurance proceeds for the benefit of the Days.

The record reveals the following evidence adduced during the bench trial of the Days' claims. On December 23, 2011, Faria and Hupp went to the Winghaven branch of the St. Charles City-County Library where librarian Lauren Manganelli

---

1. "Faria" generally refers to Betsy Faria while we use Russell Faria's full name when referring to him. Likewise, "Hupp" refers to Pamela Hupp, and we refer to Mark Hupp by his full name.

2. The State has never charged Hupp with this murder.

3. *State v. Russell Faria,* Case No. ED100964, order dated Feb. 24, 2015.

witnessed Faria's execution of the change-of-beneficiary form. Manganelli testified at trial that she spoke with both Hupp and Faria. She believed it was Hupp who said that Faria was divorcing and changing the beneficiary on her life-insurance policy so that Faria's children could be included. After her initial testimony, Manganelli read from her 2014 deposition in which she had stated that she did not remember Hupp and Faria specifically talking about spending the money. In her deposition, Manganelli stated she believed it was Faria who mentioned the divorce and changing her insurance to her children. In a portion of her deposition read at trial, Manganelli had further stated that the implication for her was that the life-insurance proceeds were to take care of Faria's children.

Faria underwent a chemotherapy treatment on December 27, 2011, four days after changing the beneficiary of her State Farm life-insurance policy. A longtime family friend, Bobbi Wann, accompanied Faria. Wann testified via deposition that Faria had told her no one else planned to attend Faria's chemotherapy treatment that day. Wann said that Faria seemed surprised when Hupp arrived. Wann testified that Faria stated in Hupp's presence that she—Faria—had removed her husband from her insurance policy because she wanted the girls—Leah and Mariah Day—to receive the insurance proceeds. According to Wann, Hupp then stated that she would make sure the girls received the money. Wann explained that she had no discussion, nor did she overhear any discussion, about why Faria named Hupp the beneficiary if Faria wanted her daughters to have the life-insurance proceeds. Wann never heard Faria say that the girls should receive the funds immediately. Wann did not ask Faria why she did not name a family member as her beneficiary.

Faria was murdered in her home later that day. The day after Faria's death, family members gathered at the apartment of Faria's mother. Several witnesses testified that Hupp was also present. Faria's sister, Pamela Welker, testified that the day after Faria's murder, Hupp volunteered to her that Faria had requested the change in beneficiary in order to make sure her children were taken care of. Welker stated Hupp was very clear that Faria intended the money for Leah and Mariah Day although Hupp provided no specifics about when and how much each of her daughters was to receive. Welker testified that Hupp said she intended to give the insurance money to the girls as requested. Welker had no knowledge of any specific terms concerning the Days' receipt of the money. Wann also testified in her deposition that she heard Hupp tell Faria's mother at this time that the insurance money was for the girls.

Janet Meyer, Faria's mother, testified that Hupp came to visit her in January 2012. Meyer reported asking Hupp whether she remembered that the insurance money was for the girls. Meyer testified that Hupp "shook" her head as if she agreed with what Meyer said. Meyer had trusted Hupp to give the money to Faria's daughters.

Another of Faria's sisters, Julie Swaney, testified that Hupp and Faria had met through work in the insurance business and had been friends for several years. She knew that Faria had other life-insurance policies in addition to the State Farm policy in question, and to her knowledge, Hupp was not named beneficiary on those policies. Swaney did not know why Faria named Hupp as her beneficiary. She also testified that Faria died intestate, and as far as she knew, Faria had never established a trust or a guardianship for her daughters. Swaney stated she telephoned

Hupp in March 2012 to ask about Hupp's plans for the life-insurance proceeds. Swaney reported that Hupp said she had given all the money to charity. Swaney described telephoning Hupp again two to three weeks later, and at that time Hupp talked about establishing a trust for the girls. Swaney testified that Faria had problems with her daughters' behavior, including possible drug use, stealing, and irresponsibility. She stated, however, that Leah and Mariah Day "were always [Faria's] top concern."

Rita Wolf had been friends with Faria since high school. Wolf believed that Faria was "somewhat" competent at her job selling insurance, that Faria "flew by the seat of her pants," and "asked for a lot of help off and on." Wolf testified that in October 2011, Faria asked her to be the beneficiary on Faria's life-insurance policy. Wolf explained that she declined to be the beneficiary, and suggested more than once that Faria name one of her sisters instead. Wolf explained that Faria asked her what she knew about trusts because Faria wanted something of that nature for her daughters. Wolf then described how she and Faria discussed in detail when and how much the girls would receive. Wolf described a further discussion with Faria between Thanksgiving and Christmas 2011 when they talked about money for the girls' achievement of certain milestones, including a wedding for each daughter, Leah's attainment of her cosmetology license, and Mariah's high-school graduation, purchase of a car, and college attendance. Wolf stated that Faria made notes of the points they discussed and took the notes with her after the discussion. Wolf testified that she and Faria "went through pretty much with a fine[-]tooth comb

where [Faria] wanted every dollar to go," and that all of it was to go to Faria's daughters.

Ryan McCarrick was a detective sergeant with the Lincoln County Sheriff's Department at the time of Faria's murder. He interviewed Hupp in June 2012, prior to Russell Faria's first trial. Detective McCarrick testified that Hupp told him during this interview that Faria wanted Hupp to be the beneficiary in order to get the money to Faria's daughters. Detective McCarrick explained that Hupp had originally made a statement of this nature to two other investigators shortly after the murder.[4] Hupp did not tell Detective McCarrick that she planned to use the money for herself or that Faria intended the money for Hupp personally. Detective McCarrick testified that he did not pressure Hupp to create a trust for the Days, but that he did tell her the lack of a trust was a "problem" with Faria's family. He also explained that he told Hupp that the Lincoln County Prosecutor wanted to know Hupp's intentions for the money so that the prosecutor could prepare the criminal case against Russell Faria. Detective McCarrick testified that he said to Hupp something to the effect that it would help if she set up a trust before Russell Faria's trial. He characterized that discussion with Hupp as one in which he explained that Russell Faria's defense might raise this issue in the murder trial. Detective McCarrick affirmed that he did not discuss with Hupp when, where, how, or how much money the Days were to receive.

Wolf further testified that she spoke to Hupp at Russell Faria's first trial, telling Hupp that Betsy Faria really wanted her daughters taken care of. Wolf reported

**4.** Detective Kaiser and Detective Smith were working with the Major Case Squad of Greater St. Louis, and interviewed Hupp the day after Faria's murder. Neither Kaiser nor Smith testified at the trial of this case.

that Hupp said they would be taken care of because Hupp had established a trust.

Hupp testified at Russell Faria's first trial in November 2013. Portions of that testimony were admitted into evidence in the trial of the present case, and are included in the record before us. At the time of Russell Faria's first trial, Hupp explained that Betsy Faria changed her life-insurance policies multiple times, depending on whom she was angry with at the time. Hupp stated that Faria did not have a lot of discretionary money, and had applied for food stamps shortly before her death. She conceded that the change of beneficiary was an easy way for Faria to guarantee that the insurance proceeds went to her daughters instead of to her husband. Hupp explained in Russell Faria's first criminal trial that she placed $100,000 in trust for Betsy Faria's daughters, and that she was trying to use the other $50,000 to help the child of another friend who had recently died of breast cancer.

The plaintiffs introduced Hupp's videotaped deposition at trial, the plaintiffs then called Hupp to testify, and finally the defense called Hupp as a witness. In her 2014 deposition played for the court during trial, Hupp testified that she had no memory problems although she was on disability because of issues with her neck, back, and legs. Hupp considered Faria one of her best friends. Hupp explained that Faria viewed her as rich, she never asked Faria for money, Faria never said that she wanted to help Hupp financially, and she did not need Faria's financial help. Hupp stated in her deposition that she first learned that Faria was naming Hupp as her beneficiary "[w]hen I was sitting in the library and she pulled out the form."

According to Hupp's deposition testimony, Faria did "not really" tell her why Faria wanted Hupp as beneficiary. Hupp repeatedly stated "absolutely not" when asked if Faria told her that she wanted Hupp to use the insurance proceeds for Faria's daughters or that Faria said she wanted Hupp to hold the money for their benefit until the girls were older. Hupp explained that Faria said she did not want her husband, her daughters, her mother, or her sisters to have the money. Hupp initially stated that she "never even talked to anybody about the policy." Then she confirmed that she told police and Faria's family about the policy although she could not remember what she said to them. The police interviewed Hupp at her home the day after Faria's murder. Hupp testified repeatedly in her deposition that she did not remember whether she told the police that Faria told her to give money to Faria's daughters. She denied telling Faria's family that she would use the money for Faria's daughters. Hupp admitted she lied to Swaney about donating the money to charity in an effort to make Swaney stop calling her. She denied telling Manganelli, the librarian, that Faria was changing her life-insurance beneficiary because Faria wanted her daughters to receive the money instead of her husband. Hupp denied having any discussion with Wann about the life-insurance policy or being present when Faria discussed it with Wann.

At the time of her deposition in 2014, Hupp stated "[t]oday, I intend on doing nothing with that money." On the next question, when asked if she planned to spend the money, Hupp replied "I do." She then stated that she had invested the money in the housing market. Hupp's deposition testimony and related exhibits revealed that Hupp established a trust for Faria's daughters in June 2013, primarily because she "felt pressured into it" by the police, the prosecutor, and Faria's family. Hupp funded the trust with $100,000 in November 2013, near the time of Russell

Faria's first trial. Hupp stated that she did not place the full $150,000 in trust for the girls because her own mother was suffering from Alzheimer's, and she was trying to guess what some of her mother's medical expenses would be. Hupp acknowledged that she withdrew $99,700 from the trust in December 2013, stating that "[she] do[es] that with all [her] accounts." She stated that she revoked the trust entirely a few days before her July 2014 deposition because the Days said hurtful things about her in their depositions.

As mentioned, Russell Faria was granted a new trial, and ultimately acquitted in November 2015 of his wife's murder. Lincoln County Prosecutor Leah Askey testified at the trial of the present case that she had several conversations with Hupp in the fall of 2015. She described one instance when Hupp showed her a bag of money, purportedly to show that Hupp still had the insurance proceeds in dispute in this case. Hupp never told Askey that she intended to use the money for her personal benefit although she explained that she still had the money because she was in the middle of the present lawsuit.

In addition to her testimony at Russell Faria's first trial and in her deposition, Hupp testified twice during trial in the present case. When called as a plaintiffs' witness, Hupp affirmed that she testified honestly under oath in Russell Faria's 2013 criminal trial. She also affirmed that she spoke with law enforcement numerous times after Faria's death, that she believed it was important to be honest and forthright with law enforcement, and that she was truthful with law enforcement and with Askey, the prosecutor. Hupp affirmed that she had been honest in her deposition testimony as well. Hupp explained that she had suffered traumatic brain injury and concussion syndrome from multiple accidents, and that is the reason she was on

disability. She testified that she did not think she had memory problems at the time of her deposition, and that she is unaware of having memory problems when speaking but "obviously" does so.

In her first round of trial testimony, Hupp affirmed four times that she did, in fact, tell police the day after Faria's murder that Faria told her to make sure the girls received some money. Hupp then acknowledged multiple times that she told police she and Faria had the following exchange: "She said, I'm going to make you the beneficiary. If you could, when my daughters are older, give them some money. I said okay." Hupp testified that she told law enforcement something to the effect "that [Faria] would have liked her daughters to have some money." She stated her initial intention was "[t]o give them some money. Could be for a boat, could be for this. ... Could be for all kinds of things." Hupp testified that she lied to Swaney about the insurance proceeds and to "[a]nybody that would bug me and bug me and bug me and bug me" but not to police because she did, in fact, establish a trust for the Days.

Hupp testified that she no longer had the insurance proceeds because she had used the money to purchase a house at auction. She then stated that she did not consider those same funds to be the life-insurance proceeds because the proceeds have "always been commingled with my own money. ... I couldn't tell you what directly came out of that check. I used the $150,000 that I showed Leah Askey."

In his May 2015 deposition, Mark Hupp testified about his and Hupp's finances. He stated that Hupp never told him why Faria had named Hupp as beneficiary, that he was not aware whether she ever told him she intended to use the money for her mother's medical bills, and that he could not recall whether she ever told him that

she used $50,000 of the insurance proceeds to help the family of a friend with breast cancer. Mark Hupp further testified that he and Hupp had been married for 32 years, that she had back problems, that he was not aware she was ever diagnosed with memory issues, and that she did not suffer from dementia or any condition of that nature. Mark Hupp also testified at trial about his and Hupp's finances and their various house purchases since receiving the life-insurance proceeds.

Later, Hupp was called to testify at trial as a witness for the defense. Hupp explained how she and Faria went through training and licensure to sell life insurance, and how they worked together in life insurance and annuities for about ten years. Hupp described two discussions she had with Faria in early December 2011 about changing the beneficiary on Faria's life-insurance policy. Hupp explained that Faria wanted her husband off of her insurance; that "[s]he was questioning people on who should be beneficiaries of her money[;]" that Faria used Hupp "as a sound board on what to do with [the insurance proceeds] in our first conversation in the beginning of December[;]" and that Faria mentioned her mother, sisters, and daughters themselves as potential beneficiaries. Hupp testified that Faria was "adamant" about not naming the girls themselves as beneficiaries because Faria was concerned about their disrespectful and irresponsible behavior. Hupp stated that Faria planned to change the beneficiary on another life-insurance policy she owned to one of her cousins. When confronted with her deposition testimony—in which Hupp stated that she only learned of the change at the library—Hupp explained that she only learned that she was to be "officially the beneficiary" when she and Faria were at the library.

Hupp testified that Faria told her about two weeks before making the change that Faria wanted to name Hupp as her beneficiary. Hupp stated that she was not comfortable with it, but eventually she agreed. She explained that Faria "just kept saying it," until Hupp agreed, and that Faria said "if you could, when they get older, if you could give them some money or help them out, to that effect." Hupp stated that Faria said nothing else about use of the proceeds. Hupp denied that she said anything to Faria's family about the life-insurance policy until Faria's sisters and brothers-in-law made comments to Hupp some three days after Faria's death.

The court entered judgment in favor of Pamela and Mark Hupp on both counts. The trial court made limited express credibility determinations, stating that it had accepted some of the testimony of each witness as credible and rejected other parts of the testimony of some witnesses as not credible. The court wrote that its findings were consistent with its determination of the credibility of the evidence and witnesses. The trial court's findings, however, primarily are only a recitation of what each witness testified to. The findings generally fail to identify particular evidence the court believed or disbelieved and the facts as the court found them.

The trial court did find that "[s]ince on or about the 28th day of December, 2011, Pamela Hupp has made inconsistent statements regarding the intended use of the proceeds of the life insurance policy and has lied to Julie Swaney about gifting said proceeds to charity...." The trial court then pointed to inconsistencies in Hupp's statements, including whether or not she has memory problems and whether or not she intends to give the Days any of the insurance proceeds. The trial court expressly found credible the following state-

ment Hupp made to police the day after Faria's murder:[5]

> And [Faria] goes, would you be my beneficiary on my life policies and make sure my kids get it when they need it. And I said, well, I could. ... She said, I'm going to make you the beneficiary. *If you could, when my daughters are older, give them some money. I said, "Okay."*

(Emphasis added.) The trial court continued:

> The [c]ourt finds that this quote from Pamela Hupp is credible. In determining the credibility of a witness, it is often true that if a person lies once, then they have lost their credibility for anything else they say. This situation is different. Pamela Hupp has lied on occasion but she is not a very good liar. Pamela's admissions in this trial about when she lied previously are probably true. In other words, it is pretty easy to tell when she is lying and when she is not. Judging from the totality of the circumstances the [c]ourt finds that the above version of this conversation between Betsy [Faria] and Pam [Hupp] about the insurance proceeds is very likely almost exactly what occurred. This quote seems natural under the circumstances and makes sense in the context. The [c]ourt finds that this conversation does not constitute an enforceable promise. ... Furthermore, Pam Hupp *doesn't necessarily promise* to do anything, nor does Betsy Faria rely on a promise of Pam Hupp. Pam Hupp's response "I could" is not a statement that she will do anything. *It is a stretch to suggest that Hupp's response "Okay" to Betsy's statement "if you could" is a promise that imposes an absolute obligation on Hupp to do anything.* Hupp's response

"Okay" is in response to [Faria's] declaration that [Faria] apparently has already decided what she wants to do, namely to make Hupp the beneficiary. [Faria] does not change the beneficiary designation in reliance on anything Hupp said or inferred. Betsy said "If you could" give my daughters some money when they are older. "Could" is only a conditional and we don't know what the conditions were supposed to be. It imposes no definite obligation on Pam Hupp.

(Emphases added.)

The trial court stated that the evidence was insufficient to establish that Faria intended the life-insurance proceeds to be used exclusively for the benefit of her daughters. In view of its finding that Hupp made no enforceable promise to Faria, the trial court determined that the Days did not meet their burden of proof for the elements of either constructive fraud or unjust enrichment. The trial court concluded:

> The way to honor [Faria's] memory and the proper course of action for the [c]ourt under the law and the evidence is not to speculate about what she might have intended. It is rather to give effect to what she actually did, which is to allow her close friend Pamela Hupp to use the money at Pamela's discretion.

The Days appeal.

### Discussion

The Days assert three claims of error. They claim that: (1) the trial court erroneously declared and applied the law when it applied the elements of fraudulent misrepresentation rather than the elements of constructive fraud to the Days' claim of constructive fraud; (2) the trial court erro-

---

**5.** Neither a recording nor a transcript of Hupp's December 28, 2011 statement to police was included in the record before this Court.

neously applied the law to the Days' claim of unjust enrichment when it required that the Days prove Hupp engaged in fraudulent conduct in being named the beneficiary of Faria's life-insurance policy; and (3) the trial court erred in determining that Hupp did not make a promise to Faria to use the proceeds of the life-insurance policy for the benefit of the Day sisters. The Days contend that the trial court's decision is not supported by substantial evidence and is against the weight of the evidence.

### Standard of Review

■ On review of a court-tried case, we will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Ivie v. Smith*, 439 S.W.3d 189, 198-99 (Mo. banc 2014); *Tobias v. Korman*, 141 S.W.3d 468, 473 (Mo. App. E.D. 2004). We apply the same standard of review in all types of court-tried cases, regardless of the burden of proof at trial. *Ivie*, 439 S.W.3d at 199.

Substantial evidence is evidence that, if believed, has some probative force on each fact necessary to sustain the trial court's judgment. *Id.* Evidence carries probative force if it has any tendency to make a material fact more or less likely. *Id.* When reviewing whether the trial court's judgment is supported by substantial evidence, we view the evidence in the light most favorable to the judgment. *Id.* at 200. We accept as true the evidence and inferences favorable to the trial court's judgment and disregard all contrary evidence. *Id.* We also defer to the trial court's credibility determinations, recognizing that the trial court is free to believe any, all, or none of the evidence presented at trial. *Id.*

■ Our Supreme Court has made clear that we need not consider any contrary evidence on a substantial-evidence challenge, regardless of whether the burden of proof at trial was by a preponderance of the evidence or by clear, cogent, and convincing evidence. *Id.* Thus, any reference to or reliance on evidence and inferences contrary to the judgment is irrelevant to an appellant's challenge to a factual proposition necessary to sustain the judgment as not supported by substantial evidence. *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo. App. S.D. 2010). Such contrary facts and inferences offer no help to us in determining whether the evidence and inferences favorable to the challenged proposition have probative force upon the proposition and constitute evidence from which the trier of fact can reasonably decide that the proposition is true. *Id.*

■ On the other hand, a claim that the judgment is against the weight of the evidence presupposes the existence of sufficient evidence to support the judgment. *Ivie*, 439 S.W.3d at 205. The term "weight of the evidence" refers to an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact. *Id.* at 206. "Weight" means the probative value of evidence, not the quantity. *Id.* (citing *White v. Dir. of Revenue*, 321 S.W.3d 298, 309 (Mo. banc 2012)). "The weight of the evidence is not determined by mathematics, but on its effect in inducing belief." *Houston*, 317 S.W.3d at 186. A contention that a necessary proposition is against the weight of the evidence challenges the probative value of that evidence to induce belief in the disputed proposition when viewed in the context of the entirety of the evidence before the trier of fact. *Id.* The against-the-weight-of-the-evidence standard of review serves only as a check on a trial court's potential abuse of power in weighing the evidence, and we will reverse the judgment only in rare cases

when we have a firm belief that the judgment is wrong. *Ivie*, 439 S.W.3d at 206.

When reviewing the record in a challenge to the weight of the evidence, we defer to the trial court's findings of fact when the factual issues are contested and when the facts as found by the trial court depend on credibility determinations. *Id.* A trial court's judgment is against the weight of the evidence only if the court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. *Id.* When the evidence poses two reasonable, although different conclusions, we must defer to the trial court's assessment of that evidence. *Id.*

We defer on credibility determinations when reviewing a challenge to a judgment as being against the weight of the evidence because the trial court is in a better position to weigh the contested and conflicting evidence in the context of the whole case. *Id.* The trial court is in a position to judge directly not only the demeanor of witnesses, but also their sincerity, character, and other trial intangibles that the record may not completely reveal. *Id.* Accordingly, the against-the-weight-of-the-evidence standard of review takes into consideration which party has the burden of proof and that the trial court is free to believe all, some, or none of the evidence offered to prove a contested fact. *Id.* We will not re-find facts based on credibility determinations through our own perspective. *Id.* When addressing a challenge that the judgment is against the weight of the evidence, we can consider evidence contrary to the trial court's judgment that is not based on a credibility determination. *Id.* Finally, this Court will not consider evidence outside the record on appeal. *In*

*re Adoption of C.M.B.R.*, 332 S.W.3d 793, 823 (Mo. banc 2011).[6]

### Did Hupp Make an Enforceable Promise to Faria?

For the sake of clarity, we first address the Days' final point because the question whether Hupp made an enforceable promise to Faria is the pivotal issue in the case. The Days claim that:

> The trial court erred in entering judgment against Daughters on Counts I and II of their Second Amended Petition on the ground that Pam Hupp did not make a promise to [Faria] upon which [Faria] relied to use the proceeds of [Faria]'s life insurance policy for the benefit of Daughters, because the judgment was not supported by substantial evidence and was against the weight of the evidence, in that eight non-party witnesses testified that Pam Hupp promised [Faria] that she would use the life insurance proceeds for the benefit of the Daughters, no non-party witness testified otherwise, and even Pam Hupp herself admitted making the promise immediately before [Faria] added Pam Hupp to the policy.

The Days' appellate brief combines a substantial-evidence challenge and an against-the-weight-of-the-evidence challenge in a single point relied on. These are distinct claims, and must appear in separate points to be preserved for appellate review. *Id.* at 199 n.11. Nonetheless, we will address the merits of the Days' claims.

In count I, the Days claimed constructive fraud. "Courts have equated constructive fraud with the breach or violation of a fiduciary, or confidential, relationship." *Tobias*, 141 S.W.3d at 476. A party may prove constructive fraud by

---

**6.** An appellate opinion that relies on facts outside the record departs from the rules of our Supreme Court and is not supported by the law. *C.M.B.R.*, 332 S.W.3d at 823 n.24.

showing that the benefactor made disposition of the property in question in reliance upon an agreement, either express or implied, to handle the property in a certain manner, followed by a breach of that agreement. *Id.* Clear, cogent, and convincing evidence is required to establish constructive fraud. *See Fix v. Fix*, 847 S.W.2d 762, 768 (Mo. banc 1993)(absent clear, cogent, and convincing evidence of agreement or understanding on which deceased sister relied to dispose of her property by joint accounts with right of survivorship, proof of constructive fraud was insufficient).

■ As to unjust enrichment, pled in count II, the elements are: (1) the defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it would be unjust to allow the defendant to retain the benefit. *Executive Bd. of Mo. Baptist Convention v. Windermere Baptist Conference Ctr.*, 280 S.W.3d 678, 697 (Mo. App. W.D. 2009).

■ The Days' second amended petition for equitable relief prayed for creation of a constructive trust in count I, and for money damages and/or a constructive trust in count II. A court may establish a constructive trust "to remedy a situation where a party has been wrongfully deprived of some right, title, benefit or interest in property as a result of fraud or in violation of confidence or faith reposed in another." *Fix*, 847 S.W.2d at 765. A court of equity may employ a constructive trust to provide a remedy in cases of actual or constructive fraud or unjust enrichment. *John R. Boyce Family Trust v. Snyder*, 128 S.W.3d 630, 638 (Mo. App. E.D. 2004). The Days' claims of both constructive fraud and unjust enrichment depend entirely upon the proposition that Hupp made an enforceable promise to Faria to use the life-insurance proceeds for the benefit of Faria's daughters, leading to an agreement between Faria and Hupp and imposing a legal obligation on Hupp.

The trial court made limited express credibility determinations. The trial court's findings primarily summarize the witnesses' testimony without accompanying findings whether the testimony was true. The court's limited and imprecise findings make our review very difficult. The trial court did not tell us what evidence the court found credible and what propositions the trial court believed or rejected. Indeed, the trial court apparently disbelieved much of the testimony summarized in its judgment.

However, the trial court did make express findings regarding Hupp's credibility. Despite acknowledging that Hupp's inconsistent statements damaged her overall credibility, the trial court opined that "it is pretty easy to tell when she is lying and when she is not," Importantly, the court expressly found credible the following description of Hupp's exchange with Faria:

> And [Faria] goes, would you be my beneficiary on my life policies and make sure my kids get it when they need it. And I said, well, I could. ... She said, I'm going to make you the beneficiary. *If you could, when my daughters are older, give them some money.* I said, "Okay."

(Emphasis added.)

■ The trial court found Faria's words, "[i]f you could," to be precatory in reaching its determination that Hupp made no enforceable promise. "Precatory" words are those "requesting, recommending, or expressing a desire rather than a command." *Black's Law Dictionary* (10th ed. 2014), *available at* Westlaw BLACKS. A "precatory trust" is "[a] trust that the law will recognize to carry out the wishes of the testator or grantor even though the

statement in question is in the nature of an entreaty or recommendation rather than a command." *Id.* Precatory words include those such as "wish," "will," "will and desire," "request," and so forth. *Rouner v. Wise*, 446 S.W.3d 242, 256 (Mo. banc 2014)(quoting *Estill v. Ballew*, 26 S.W.2d 778, 780 (Mo. 1930)). They also include "hope," "expectation," and "desire." *Estill*, 26 S.W.2d at 780. The question here, as in every case involving precatory language and disposition of property, is whether the words express merely the grantor's wish or whether they express her will. *Pearson v. First Congregational Church of Joplin*, 106 S.W.2d 941, 947 (Mo. App. Spfld. 1937)(quoting *Lemp v. Lemp*, 264 Mo. 533, 175 S.W. 618, 620 (Mo. 1915)).

"A trust is not lightly imposed on mere words of recommendation and confidence when property is given absolutely." *Estate of McReynolds*, 800 S.W.2d 798, 800 (Mo. App. E.D. 1990). "Historically, Missouri courts have been hesitant to find an intention to create a trust when the settlor uses such precatory language." *Rouner*, 446 S.W.3d at 256. For a trust to arise from the use of precatory words, the court must be satisfied from the words themselves, considered in connection with all the other terms of the disposition, that the grantor's intention to create a trust was as complete and certain as if she had given the property to hold in a trust declared in the ordinary manner. *Estill*, 26 S.W.2d at 780.

In the context of estates, courts must observe two rules of construction. *Blumer v. Gillespie*, 338 Mo. 1113, 93 S.W.2d 939, 940 (Mo. 1936). First, where a devise gives an absolute title, that title cannot be cut down by any later provisions of the will unless the later provisions are as clear and definite as the language granting absolute title. *Id.* at 940-41. Second, an absolute title cannot be cut down

by a later clause of the will expressing a mere wish or desire as to the use and final disposition of the property, but leaving such to the discretion of the devisee. *Id.* at 941. While this case does not involve the construction of a will or trust, we nevertheless draw guidance from cases in that area of law where the courts were called upon to analyze the precatory words of a grantor or testator when discerning her intent.

Although we well recognize that this dispute is not in the context of trusts and estates, several facts as found by the trial court support its determination that Hupp made no enforceable promise. The one undisputed fact, as the trial court noted, was that Faria named Hupp as her sole, unconditional beneficiary of the State Farm life-insurance proceeds on a properly executed and submitted change-of-beneficiary form. In other words, Faria gave legal ownership of the proceeds to Hupp. The Days reiterated on appeal that they do not claim Hupp fraudulently induced Faria to change her beneficiary.

As we have noted, in disputes over trusts and estates, Missouri law has held that an absolute title cannot be cut down by a later expression of a wish or desire as to the use and final disposition of the property. *Id.* Reasoning by analogy, we first observe that here as in the context of trusts and estates, the burden of proof is on the party challenging a clear and definite disposition of property. Second, as plaintiffs the Days must prove their claim(s)—both the fact of wrongful taking or retention of the insurance proceeds as well as tracing the proceeds—by clear, cogent and convincing evidence. *Boyce Family Trust*, 128 S.W.3d at 638. For a court to impose a constructive trust to provide a remedy in cases where one has acquired property under such circumstances as make it inequitable for her to

retain the property, Missouri law requires evidence that is "unquestionable in character and so clear, cogent and convincing as to exclude every reasonable doubt in the mind of the trial court." *Ralls County Mut. Ins. Co. v. RCS Bank*, 314 S.W.3d 792, 795-96 (Mo. App. E.D. 2010). The beneficiary designation here was unequivocal and unchallenged, whereas the evidence of promises or assurances regarding the intended use of the proceeds was vigorously disputed and could be rejected by the finder of fact.

The trial court also observed that Faria had worked in the life-insurance business for many years and would have known how to require Hupp to use the life-insurance proceeds for the benefit of the Days, had that been Faria's intent. In *Rouner v. Wise*, the evidence revealed that the grantor of a trust was interested in and had a detailed understanding of his estate planning. 446 S.W.3d at 257. Our Supreme Court stated the most that could be inferred from the text of a handwritten letter and certain extrinsic evidence was that the grantor knew the dispositions he "desired," as set forth in his letter, were inconsistent with the dispositions required by the terms of his trust. *Id.* at 259. "Putting this evidence together with the text of the letter, therefore, merely reinforces the inference that [the grantor] 'wished' his property to be disposed of according to the letter, not that he believed or intended the letter would legally require the Children to do so." *Id.*

In *Massey v. Massey*, a grantor had established an express trust, and had formally executed it, filed it, and amended it on multiple occasions with the help of an attorney. 464 S.W.3d 577, 581-82 (Mo. App. S.D. 2015). The Southern District observed, *inter alia*, that these actions indicated an understanding of estate planning. *Id.* at 592. The Court reversed the trial court's judgment as against the weight of the evidence where the trial court concluded that the grantor intended to amend her trust via several informal handwritten notes. *Id.* at 593. The reviewing Court characterized the notes as "merely to advise her heirs as to how she would like her property to be disposed, and only vaguely so at that." *Id.* at 592.

In *Porter v. Falknor*, a husband and wife executed a joint will. 895 S.W.2d 187, 188 (Mo. App. E.D. 1995). One section of the joint will provided that it was the couple's "mutual desire" that the survivor execute a new will leaving all property held by the survivor to the couple's child and niece in equal shares. *Id.* The Court pointed to the definite words contained in other provisions of the will—such as "give, devise and bequeath" and "hereby direct"—to find that the couple "knew how to make a term definite, but did not do so in item six where they used the words 'our mutual desire.'" *Id.* at 189. The Court concluded the evidence was insufficient to support a finding that the couple had contracted to make a will. *Id.* at 190.

Finally, the trial court believed Hupp's testimony that she told Faria to name someone else as beneficiary of the life-insurance policy, and that Hupp felt pressured by law enforcement and Faria's family to establish a trust. These additional factors support the trial court's conclusion.

Based on Hupp's version of the discussion with Faria, which the trial court expressly accepted, the trial court determined that Hupp made no enforceable promise. Without an enforceable promise, Faria and Hupp could not have had an agreement that Hupp would use the insurance proceeds exclusively for the Days' benefit. Instead, the trial court found that any assurance Hupp made to Faria was merely of a conditional or discretionary character that fell short of imposing a legal

obligation on Hupp. Consequently, the trial court proceeded to conclude that the Days had failed to meet their burden of proof regarding the elements of either constructive fraud or unjust enrichment.

The trial court's acceptance of Hupp's version of events and its conclusion that Hupp made no enforceable promise to Faria hinges on its explicit and implicit credibility determinations. We may have made different credibility determinations had we been in the trial court's position. That, however, is not our prerogative given our standard of review. "[T]he appellate court will not re-find facts based on credibility determinations through its own perspective." *Ivie*, 439 S.W.3d at 206. Where, as here, the resolution of conflicting testimony is required to determine the merits of an against-the-weight-of-the-evidence argument, we defer to the trial court's credibility determination in the same manner as we do in a resolution of a not-supported-by-substantial-evidence argument. *Houston*, 317 S.W.3d at 186.

Had the trial court made different credibility determinations, concluded that Hupp made an enforceable promise to Faria, and ruled in favor of the Days, we would affirm. But accepting, as we must, the trial court's determination that Hupp made no enforceable promise to Faria to use the life-insurance proceeds for the benefit of the Days, we cannot say that the trial court's judgment is unsupported by substantial evidence, nor can we say that it is against the weight of the evidence. We deny the Days' third point.

### Did the Trial Court Misapply the Law of Constructive Fraud and Unjust Enrichment?

In their first point, the Days claim that the trial court erroneously applied the law when it applied the elements of fraudulent misrepresentation to the Days' claim of constructive fraud. In their second point, they claim the trial court erroneously applied the law to the Days' claim of unjust enrichment when it required that the Days prove Hupp engaged in fraudulent conduct in being named the beneficiary of Faria's life-insurance policy.

"No appellate court shall reverse any judgment unless it finds that error was committed by the trial court against the appellant materially affecting the merits of the action." Rule 84.13(b). Thus, even assuming without deciding that the trial court erroneously applied the law concerning the elements of constructive fraud and unjust enrichment, we are still compelled to affirm the trial court's judgment because of our resolution of the Days' third point on appeal.

As to the Days' first claim, constructive fraud equates to a breach of a fiduciary or confidential relationship. *Tobias*, 141 S.W.3d at 476. A confidential relationship exists when one person relies on and trusts another with management of her property and attendance to her affairs, thereby creating some degree of fiduciary obligation. *Id.* When a fiduciary or confidential relationship is shown to exist, no proof of actual fraud is necessary in order to establish a constructive trust because a breach of a confidential relationship is, in itself, constructive fraud. *Id.* Proof of constructive fraud necessarily depends on the circumstances of each case. *Id.* A party may prove constructive fraud by showing that in disposing of her property the grantor relied on an agreement, either express or implied, to handle the property in a certain manner, followed by a breach of that agreement. *Id.*

As to the Days' second claim, the third element of unjust enrichment—unjust retention of the benefit—is the most significant and the most difficult. *Mo. Bap-*

*tist Convention*, 280 S.W.3d at 697. Mere receipt of a benefit is not enough to establish unjust enrichment absent a showing that it would be unjust for the defendant to retain the benefit. *Id.*

The Days' theory of the case was that Hupp promised Faria she would use the life-insurance proceeds for the benefit of Faria's daughters, and that Faria relied on this promise because of her trust and confidence in Hupp. The Days maintained that Faria changed her life-insurance policy with the express intention that Hupp would use the proceeds for the benefit of Faria's daughters. Given the trial court's credibility determinations—which we are bound to accept—that lead to its conclusion that Hupp made no enforceable promise to Faria, the Days were unable to establish either that Hupp breached an agreement with Faria or that Hupp's retention of the life-insurance proceeds was unjust.

In determining prejudice in a court-tried case, the question is whether the outcome of the case would have been different absent the trial court's alleged error. *Blue Pool Farms, LLC v. Basler*, 239 S.W.3d 687, 690 (Mo. App. E.D. 2007). Even assuming, *arguendo*, that the trial court erroneously applied the law regarding the elements of one or both claims, the Days cannot establish prejudice—in other words that they would have prevailed absent the alleged misapplications of the law—when they were unable in other respects to prove either claim. We deny the Days' first and second points.

### Conclusion

We cannot re-weigh the evidence. Our standard of review requires us to defer to the trial court's determination in which the court found Hupp's version of events was credible, and thus she made no enforceable promise to Faria to use the life-insurance proceeds for the benefit of the Days. Without proving that Hupp made such a promise to Faria that led to an agreement between the two women, the Days cannot establish either constructive fraud or unjust enrichment. Consequently, we affirm the trial court's judgment, given that the trial court believed Hupp's version of events about the promise and agreement, or more precisely the lack of an enforceable promise and agreement.

PHILIP M. HESS, C.J., and JAMES M. DOWD, J., concur.

