

# In the Missouri Court of Appeals
## Eastern District
### NORTHERN DIVISION

A.A.B. and A.M.B.,
Individually and as Next Friend for
A.A.B.,

                  Respondents,

vs.

A.D.L.,

                  Appellant,

and

J.B.U.,

                  Defendant.

No. ED106013

Appeal from the Circuit Court
of Marion County

Honorable John J. Jackson

Filed: April 16, 2019

The mother, A.D.L., appeals the judgment entered by the Circuit Court of Marion County awarding third-party custody of the minor child to A.M.B., the man the child knew as his father for the first nine years of his life ("the putative father"). The trial court found the mother and the biological father, J.B.U.,[1] unfit and unsuitable custodians, found that the welfare of the child required an award of custody to the putative father, and found that granting custody to the putative father was in the best interests of the child. When deciding appeals from trial courts, we sit as a court of review. The case was litigated and adjudicated as a third-party custody case, so

---

[1] The biological father does not appeal.

we review it as such. Because the trial court's findings are sufficient to support its award of third-party custody to the putative father, and because the award is not against the weight of the evidence, we affirm as modified.

*Facts*

The mother and putative father met in 2003, and began dating on and off. The putative father believed that they were dating exclusively when the mother announced that she was pregnant in the summer of 2005. The mother reassured the putative father multiple times that he was the biological father of the child. The putative father testified that he attended doctor appointments and Lamaze classes with the mother, and that he was present in the delivery room when the mother gave birth to the minor child, A.A.B., in February 2006. Both the putative father and mother signed an affidavit of paternity naming the putative father as the child's biological father. Thus the child's birth certificate bore the putative father's name, and the child carried the putative father's surname. The mother and putative father lived together after the child's birth, and the putative father helped care for the child. The mother and putative father continued to live together with the child until they separated early in 2007.

After the mother and putative father separated, the putative father enjoyed visitation with the child on alternating weekends for eight years. The child called the putative father "dad," and they engaged in many activities together: cooking meals; visiting the putative father's family where the child played with his cousins; riding bicycles, ATVs, and horses; lifting weights; hunting and fishing; playing ball and video games; and attending church. The putative father and child typically spoke or texted once or twice each week. The putative father always celebrated the child's birthday, gave him birthday and Christmas gifts, and celebrated holidays with him.

2

Both parties testified that the putative father and mother successfully coordinated their holiday parenting time with the child.

In 2008, the mother successfully pursued a child-support action against the putative father through the Missouri Department of Social Services, during which the mother represented that the putative father was the child's biological father. Over the next several years, the putative father paid over $60,000 in child support, which the mother accepted. Yet, the mother acknowledged in her trial testimony that she was positive from the time of the child's birth that the putative father was not the child's biological father.

In May 2015, the mother telephoned the putative father and announced that he was not the child's biological father. The mother also abruptly revealed this information to the nine-year-old child, in the absence of professional mental-health support while the child was playing a video game. DNA testing later confirmed that another man, J.B.U., is the child's biological father. Within a week of her announcement to the child, the mother moved J.B.U. into her home with the child despite her knowledge of J.B.U.'s extensive criminal record. The mother acknowledged that the child did not even know of J.B.U.'s existence until her revelation. The putative father immediately filed this action[2] after the mother told him that he was not the child's biological father, told him that the child would no longer visit him, and denied the putative father his usual weekend with the child.

The mother immediately severed contact between the child and the putative father, the paternal grandparents, and the paternal aunt, with whom the child was especially close. The mother and J.B.U. gave the child a mobile phone, and instructed him not to enter the phone

---

[2] The putative father's original petition sought a declaration of his paternity, custody, and child support. After receiving the results of the DNA test, the putative father amended his petition to seek, *inter alia*, a determination of a father-child relationship and declaration that he is the child's legal father. In the alternative, the putative father sought third-party custody.

numbers of the putative father or the putative father's family on the phone. The mother permitted no contact between the child and the putative father or the putative father's family until November 2015 when the trial court entered a temporary order for visitation. The putative father, his mother, and his sister managed to visit the child briefly in mid-August 2015 at the child's school under the supervision of a counselor. But when the mother learned of the visit, she transferred the child to another school district so that the putative father would not know where the child attended school.

Even after the court ordered visitation, the mother interfered with the putative father's visitation, and she failed to take the child to court-ordered counseling. Once visitation resumed, the child no longer called the putative father "dad" except when he forgot to self-censor, and the child acted awkward and distant when the mother or J.B.U. was present. The mother and J.B.U. further interfered by not allowing the child to speak freely with the putative father by telephone, threatening to ground the child if he referred to the putative father as his father, prohibiting the child from giving his new phone number to the putative father or his family, and cursing at the putative father in the child's presence.

The guardian ad litem recommended that the court award sole physical custody to the putative father, and joint legal custody to the putative father and mother. The guardian ad litem testified that she had "significant concerns that [the child] was coached" in his testimony because the child's testimony mirrored language used by the mother and J.B.U. in texts and voicemails, that the mother's and J.B.U.'s behavior was similar to that found with parental alienation, and that she had concerns about the credibility of the mother's testimony. The guardian ad litem testified that she doubted such behavior would end unless the putative father had custody of the child.

4

The court conducted a trial over two days in May 2017. The trial court found that the mother had stopped and prohibited all contact between the child and the putative father for six months; "interfered with [the putative father's] significant bond and relationship with the minor child"; disregarded previous court orders and interfered with the putative father's visitation rights; deliberately tried to destroy the bond between the putative father and the child without any recognition of possible serious emotional harm to the minor child; attempted to alienate the child from the putative father, thus neglecting the child's emotional needs; and told the putative father's family that "she would remove all traces of them from the minor child's life." The trial court also found that the putative father is a suitable custodian and can provide a stable environment for the child; that the biological father and the mother are unfit and unsuitable to serve as custodians; that the welfare of the child requires an award of custody to the putative father; and that an award of physical custody to the putative father is in the child's best interest.

The trial court stated that it had considered the factors enumerated in section 452.375 RSMo. (2016),[3] and thus concluded that the welfare of the child required an award of sole physical custody to the putative father. The court further determined that such an award was in the child's best interest. The court, *inter alia*, awarded the mother and father joint legal custody, and ordered that the child retain the putative father's surname.[4] The mother appeals.

---

[3] All statutory references are to RSMo. (2016).

[4] The trial court in its judgment ordered that the putative father's name be removed from the child's birth certificate and replaced with the name of the biological father. The parties have not addressed this issue on appeal. We have, however, the discretion to consider on appeal plain errors affecting substantial rights, although not raised or preserved, when we find that manifest injustice or miscarriage of justice has resulted. Rule 84.13(c).

This error is evident, obvious, and clear, and affects substantial rights of the child. The doctrine of trial by implied consent provides that issues not raised by the pleadings may be determined by the trial court when a party offers without objection evidence bearing solely on that issue. *Melton v. Padgett*, 217 S.W.3d 911, 913 (Mo. App. W.D. 2007). Here, the parties did not raise in the pleadings the issue of the father to be named on the child's birth certificate, nor did they adduce evidence bearing solely on the issue. Because the issue of the father named on the child's birth certificate was not properly before it, the trial court had no authority to order alteration of the birth certificate. In addition, removal of the putative father's name from the birth certificate has significant legal consequences affecting the child's substantial rights resulting in a manifest injustice if left uncorrected. Therefore,

5

*Standard of Review*

We must affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Bowers v. Bowers*, 543 S.W.3d 608, 613 (Mo. banc 2018); *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

*Discussion*

In two points on appeal, the mother claims the trial court failed to make required findings of fact and that the evidence failed to demonstrate that she is unfit, unsuitable, or unable to maintain custody of the child.

In her first point, the mother contends that the trial court failed to make findings of fact required pursuant to section 452.375. In deciding the custody arrangement that would serve the best interests of a child, the trial court shall consider all relevant factors and enter findings of fact and conclusions of law, including the following:

> (1) the wishes of the child's parents;
>
> (2) the needs of the child for a frequent, continuing, and meaningful relationship with both parents, and the ability and willingness of parents to actively perform their functions for the needs of the child;
>
> (3) the interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;
>
> (4) which parent is more likely to allow the child frequent, continuing, and meaningful contact with the other parent;
>
> (5) the child's adjustment to home, school, and community;
>
> (6) the mental and physical health of all individuals involved, including any history of abuse of any individuals involved;
>
> (7) the intention of either parent to relocate the principal residence of the child; and
>
> (8) the wishes of the child.

---

we modify the trial court's judgment insofar as it seeks to change the person named as the father on the child's birth certificate.

6

Section 452.375.2.

When reviewing an award of custody and in the absence of specific findings, we presume the trial court considered all of the evidence and made its award in the best interest of the child. *Keel v. Keel*, 439 S.W.3d 866, 875 (Mo App. E.D. 2014). We make this presumption because the trial court is in a unique position to determine witness credibility, sincerity, character, and other intangibles that the record might not completely reveal. *Id.* The trial court is not required to make a detailed finding on each factor listed in section 452.375.2, but only to make sufficient findings on the factors relevant to the case. *Id.* at 878.

Here, the trial court expressly stated that it had considered the factors enumerated in section 452.375. While the judgment did not list each statutory factor and expressly tie each finding to a specific factor, the court nonetheless rendered sufficient findings on those factors relevant to the case. With regard to the first factor, the existence of the case demonstrates that both the mother and the putative father wanted custody of the child.

The trial court's express findings relate to the second, third, and fourth factors. As to the second factor—the needs of the child for a frequent, continuing, and meaningful relationship with both parents, and the ability and willingness of parents to actively perform their functions— the trial court made findings demonstrating that the mother had failed to consider the needs of the child. The court found that the mother informed the child that another man was his biological father without any professional mental-health support while the child played a video game. The mother then moved the biological father into the child's home within a week of this disclosure when the child had no significant prior association with the biological father, a man whom the court found to have an extensive criminal record. The trial court further found that the

7

mother had neglected the child's emotional needs by attempting to alienate the child from the putative father.

As to the third factor—the interaction and interrelationship of the child with persons who may significantly affect the child's best interests—the trial court found that the mother had stated to the putative father's family that she would remove all traces of them from the child's life.

The trial court's most extensive findings relate to the fourth factor—which party is more likely to allow the child frequent, continuing, and meaningful contact with the other. The trial court found that the mother had prohibited all contact between the child and the putative father for six months. The trial court further found that the mother interfered with and deliberately tried to destroy the bond and relationship between the putative father and the child, and that she had disregarded court orders regarding counseling for the child and visitation with the putative father. Thus, the trial court found that the putative father was more likely to allow the child frequent, continuing, and meaningful contact with the other parties.

The trial court made no specific findings regarding factors five and six, but nothing in the record suggests that those considerations were at issue in the case. The seventh factor—relocation of the child's residence—was implicitly part of the court's findings that the mother and biological father are unfit custodians, and that the child's welfare requires custody with the putative father, who lives about one hour's drive from the mother's residence. As to factor eight—the child's wishes—the court made no finding. The child testified that he wished to live with his mother, but the guardian ad litem expressed concern that the child's testimony was coached and reflected language used by the mother and J.B.U.

The trial court expressly stated that it considered the factors enumerated in section 452.375. The court made written findings with respect to the relevant factors contained in

8

section 452.375.2, and established custody in accordance with Missouri's public policy set forth in section 452.375.4. Consequently, the findings set forth in the judgment are sufficient to support the award of sole physical custody to the putative father. We deny the mother's first point.

In her second point, the mother contends that the evidence failed to demonstrate that she is unfit, unsuitable, or unable to maintain custody of the minor child. The trial court, however, awarded sole physical custody to the putative father "as the welfare of the child requires and it is in the best interest of the child." The mother does not challenge the trial court's determination that the child's welfare requires custody be awarded to the putative father, nor does she challenge the trial court's determination that custody with the putative father serves the child's best interest. These two unchallenged elements of the court's decision fulfill the requirements of section 452.375.5(5)(a) for awarding third-party custody. We could deny the mother's point on this basis alone—that she failed to challenge the bases of the court's decision. Given the serious nature of child-custody proceedings, however, we will review the custody award *ex gratia*.

Missouri law contains a presumption that the best interest of a child is best met by vesting a child's custody with the biological parent. *Bowers*, 543 S.W.3d at 615-16. However, a third party can rebut this presumption under section 452.375.5, which provides, "[p]rior to awarding the appropriate custody arrangement in the best interest of the child, the court shall consider . . . [t]hird-party custody or visitation." *Id.* at 616.

> When the court finds that each parent is unfit, unsuitable, or unable to be a custodian, or the welfare of the child requires, and it is in the best interests of the child, then custody, temporary custody or visitation may be awarded to any other person or persons deemed by the court to be suitable and able to provide an adequate and stable environment for the child.

Section 452.375.5(5)(a). "The language and context of section 452.375.5 shows that the

9

legislature intended third-party custody or visitation referenced in subparagraph (5)(a) as an alternative consideration to parental custody." *Bowers*, 543 S.W.3d at 616 (quoting *Hanson v. Carroll*, 527 S.W.3d 849, 854 (Mo. banc 2017)). This section provides a means for non-biological parents to bring an action seeking child custody or visitation. *Id.*

Section 452.375.5(5) does not authorize third-party custody or visitation merely because a court determines that it would be in the child's best interests. *Id.* In addition, the Missouri statute carries a rebuttable presumption that the parent should have custody, and presumes parental custody is in the child's best interests. *Id.* To rebut the presumption, the third party seeking custody has the burden to show *either* that each parent is unfit, unsuitable, or unable to act as the child's custodian *or* that the child's welfare requires third-party custody. *Id.* The third party must also establish that such a custody award is in the best interests of the child. Section 452.375.5(5)(a).

Here, the trial court found not only that both biological parents were unfit and unsuitable custodians for the child, but also that the welfare of the child required that the putative father have custody. The trial court awarded sole physical custody to the putative father because "the welfare of the child requires and it is in the best interest of the child." The mother contends that the evidence failed to demonstrate that she is unfit, unsuitable, or unable to maintain custody of the child. She seems to argue that the court's determination is against the weight of the evidence.

A claim that the judgment is against the weight of the evidence presupposes that sufficient evidence supports the judgment. *Bowers*, 543 S.W.3d at 615. The term "weight of the evidence" refers to an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact. *Ivie v. Smith*, 439 S.W.3d 189,

10

206 (Mo. banc 2014). "Weight" refers to the probative value of evidence, rather than the quantity of evidence. *Id.* (citing *White v. Dir. of Revenue*, 321 S.W.3d 298, 309 (Mo. banc 2012)). "The weight of the evidence is not determined by mathematics, but on its effect in inducing belief." *Day v. Hupp*, 528 S.W.3d 400, 411 (Mo. App. E.D. 2017)(quoting *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo. App. S.D. 2010)). A contention that a proposition necessary to sustain the judgment is against the weight of the evidence challenges the probative value of that evidence to induce belief in the disputed proposition when viewed with the entirety of the evidence before the trier of fact. *Id.* Our review of a judgment as against the weight of the evidence serves only as a check on a trial court's potential abuse of power in weighing the evidence, and we will reverse the judgment only in rare cases when we have a firm belief that the judgment is wrong. *Bowers*, 543 S.W.3d at 615.

When reviewing the record in a challenge to the weight of the evidence, we defer to the trial court's findings of fact when the factual issues are contested, and when the facts as found by the trial court depend on credibility determinations. *Id.* A trial court's judgment is against the weight of the evidence only if, from the record at trial, the court could not reasonably have found the existence of a fact necessary to sustain its judgment. *Id.* When the evidence poses two reasonable yet different conclusions, we must defer to the trial court's assessment of that evidence. *Id.*

Here, the disputed proposition necessary to sustain the trial court's judgment is that the welfare of the child requires that the putative father have sole physical custody. The mother asserts that the evidence demonstrated she consistently took good care of the child, and nothing in the record demonstrated any physical or emotional abuse, a chaotic home environment, or any poor judgment by the mother in her parenting.

11

"'[W]elfare' implicates pleading and proving special or extraordinary circumstances that make third-party custody or visitation in the child's best interest." *T.W. ex rel. R.W. v. T.H.*, 393 S.W.3d 144, 150 (Mo. App. E.D. 2013). Missouri courts have held that "a significant bond[ed] familial custody relationship" with third parties can constitute a special or extraordinary circumstance when analyzing the welfare of the child under section 452.375.5. *Bowers*, 543 S.W.3d at 617.

Such an extraordinary circumstance exists here in that the putative father was the only father the child knew for the first nine years of his life, and the putative father and the child had a close relationship. The putative father signed the affidavit of paternity, had his name placed on the child's birth certificate, and gave the child his surname. The putative father paid over $60,000 in child support and maintained frequent, meaningful, and consistent contact with the child. Furthermore, the putative father asserts his third-party claim as an individual whom the mother specifically invited to act as the child's father even before the child's birth. *Id.* at 616. And in fact the putative father fulfilled this role in every way for more than nine years.

The trial court recognized the significant, long-term parent-child bond between the putative father and child in its judgment. The trial court expressly found that the mother repeatedly took action to break that bond, and would continue her attempts to do so. Thus, the trial court concluded that the child's welfare required the putative father to have custody, and such custody was in the child's best interest.

The evidence likewise supports the trial court's finding that the mother is an unfit and unsuitable custodian although the trial court did not award custody to the putative father on this basis. The mother repeatedly demonstrated disregard for the child's emotional well-being when she deceived him, the putative father, and others about the child's paternity for nearly ten years;

12

when she cut off all contact for six months with the only father the child knew; when she moved a total stranger into the child's home after announcing that this stranger was the child's biological father; when she interfered in the child's relationship with the putative father after they re-established contact; and when she failed to abide by the court order that the child receive counseling.

The trial court's award of third-party sole physical custody to the putative father was not against the weight of the evidence. We deny the mother's second point.

*Conclusion*

The trial court's findings are sufficient to support its award of third-party custody to the putative father, and the award is not against the weight of the evidence. We affirm the trial court's judgment of third-party custody, but modify its judgment insofar as it seeks to change the child's birth certificate.

_____
LAWRENCE E. MOONEY, JUDGE

COLLEEN DOLAN, J., concurs.
LISA P. PAGE, C.J., dissents in separate opinion.

13



# In the Missouri Court of Appeals
# Eastern District

<u>NORTHERN DIVISION</u>

A.A.B. and A.M.B., )   No. ED106013
Individually and as Next Friend for )
A.A.B., )
     )
     Respondents, )   Appeal from the Circuit Court
     )   of Marion County
vs. )
     )   Honorable John J. Jackson
A.D.L., )
     )
     Appellant, )
     )
and )
     )
J.B.U., )
     )
     Defendant. )   Filed: April 16, 2019

<u>DISSENT</u>

    I largely concur with the majority opinion; however, I must respectfully dissent in part. I join the majority's decision to review and reverse the amendment of the birth certificate for plain error because the trial court improperly vested paternity rights in J.B.U. when the record contains nary a pleading upon which he could be declared the minor child's natural father.[1] It is because I

---

[1] This case is wholly distinguishable from *Bowers v. Bowers*, 543 S.W.3d 608 (Mo. banc 2018), because in *Bowers*, "[t]he circuit court held a bench trial on the respective petitions . . . regarding dissolution, paternity, custody, and visitation." *Id.* at 612. The biological father prevailed as to the declaration of paternity yet the trial court found him and the mother unfit, meriting an award of third-party custody. *Id.*

agree with the majority that I must dissent in the result. As a court of review, I would agree the evidence supported a finding of third-party custody in favor of A.M.B. if, in fact, J.B.U.'s paternity was properly established. However, once the majority opinion effectively and properly redacts J.B.U. from these proceedings, he becomes a legal non-entity in the minor child's life for the purposes of these proceedings, and as a result there is no longer a third party in this case. Thus, the trial court's award of third-party custody - without the proverbial third party - is improper. In addition to reversing to amend the birth certificate, I would also reverse with instructions to amend the term "third-party" to "sole physical" with respect to the award of custody to A.M.B.[2]

### Standard of Review

In her points on appeal A.D.L. ("Mother") only seeks review of whether there was substantial evidence to support the award of third-party custody. While the issue was not raised on appeal, I find the majority's decision to review the trial court's amendment of the birth certificate for plain error effectively places the propriety of an award of third-party custody before this court. Once J.B.U. is removed from the minor child's birth certificate, there is no longer a third-party to whom custody can be awarded in this proceeding. It then naturally follows that this child only has one legal father, A.M.B., to whom sole physical custody should have been awarded. By improperly amending the birth certificate, the trial court further plainly erred in awarding third-party custody. Based upon the particular facts and circumstances of this case the error is evident, obvious, and clearly affects the substantial rights of the child who

---

[2] Rule 84.14 grants our court the authority to "give such judgment as the court ought to give," unless justice requires otherwise. Based upon the record before us, it is clear the trial court considered the required factors for custody of the minor child and granted what is essentially sole physical custody to A.M.B.

2

deserves the security of a sole physical custodian as opposed to a rather tenuous award of third-party custody.[3]

As the majority correctly notes, we have the discretion to consider plain errors which affect substantial rights, even where such errors are not raised or preserved, if we find a manifest injustice or miscarriage of justice has occurred. Rule 84.13(c). However, this discretion is to be cautiously exercised and is rarely applied in civil cases. *Brown v. Brown*, 530 S.W.3d 35, 45-46 (Mo. App. E.D. 2017). Once the majority elected to exercise its discretion to review the trial court's amendment of the minor child's birth certificate for plain error, we then must equally exercise our plain error discretion to review the question of whether A.M.B. was properly designated as a third-party custodian.

### *Analysis*

A.M.B.'s Second Amended Petition clearly presented the trial court with a legal morass. However, the Uniform Parentage Act ("UPA"), Sections 210.817 to 210.852 RSMo (2016)[4] is fairly simple. Pursuant to the UPA, "parent" is defined as "either a natural or an adoptive parent," and "parent child relationship" is specified as "the *legal relationship* existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations." Section 210.817(3) – 201.817(4) (emphasis added).

Reviewing the UPA, in *pari materia*, the legislature intended the term "natural parent" to apply more broadly than only to a "biological" parent. If the legislature had intended a more narrow definition of "natural" father, it could have defined the term explicitly or utilized a

---

[3] Historically third-party custody has been considered temporary in nature and the modifying court can consider a change in circumstances of a "reformed" noncustodial parent as a factor in determining whether the best interests of the child warrant modification. *In re Marriage of Carter*, 794 S.W.2d 321, 324-35 (Mo. App. S.D. 1990). Thus, the less challenging modification standard for third-party custody is not limited to a change of circumstances of the child or his custodian for a custody modification, as set forth in Section 452.410.1.

[4] All further statutory references are to RSMo (2016).

3

different term entirely. Instead, in Section 210.823, the UPA specifically allows for a legal finding of paternity in favor of a man who may or may not be the biological father when he has executed an acknowledgment of paternity.

Pursuant to Section 210.823, the legal determination of paternity established by execution of the acknowledgment precludes either signatory from any further action to establish paternity. Subsection (2) specifically states, "[n]o judicial or administrative proceeding shall be required or permitted to ratify an *unchallenged* acknowledgment of paternity." (emphasis added). Thus, an executed acknowledgment has the legal effect of a judgment, and a man who executes an acknowledgment becomes the legal father of the minor child.

Under Section 210.823.1, such a signed acknowledgment of paternity "shall be considered a legal finding of paternity," subject to the right of either party to the document to rescind the affidavit. After the earlier of either sixty days from the date of the signature, or the date of a proceeding to establish support in which the signatory is a party, "[t]he acknowledgment may thereafter *only be challenged in court on the basis of fraud, duress or material mistake of fact,*" with the burden of proof upon the party challenging the affidavit. Section 210.823.1(2) (emphasis added).

Paternity may also be established by a blood test conducted pursuant to Section 210.834. The test results may be conclusive evidence of non-paternity should a biological father seek to assert his rights as the minor child's natural father or if a signatory to an acknowledgment of paternity asserts a material mistake of fact to rescind an affidavit. See Section 210.834 and Section 210.826; See also *Wilson v. Cramer*, 317 S.W.3d 206 (Mo. App. W.D. 2010). However, the blood test is not a legal determination of paternity. As a result, a biological father must seek

4

a legal declaration of paternity whereas a legal father, as established by a Section 210.823 executed acknowledgment of paternity, does not.

Mother and A.M.B. were never married. However, at the time of the minor child's birth, A.M.B. and Mother both signed an affidavit of paternity acknowledging A.M.B. was the child's father. The "unchallenged" acknowledgment of paternity is the pivotal consideration in this case. Section 210.823 established A.M.B. as the minor child's legal father when his parents executed the acknowledgment. This legal finding of paternity pursuant to Section 210.823 was binding upon the signatories, in this cause of action, subject only to the right of either seeking rescission solely on the basis of fraud, duress, or material mistake of fact. Neither A.M.B. nor Mother sought to so rescind the acknowledgment. In light of this unchallenged acknowledgment, A.M.B. did not need to have his paternity declared because *he was the minor child's legal father*. Section 210.823.1(2) emphatically states "[n]o judicial or administrative proceeding shall be required or permitted to ratify an *unchallenged* acknowledgment of paternity." (emphasis added). Therefore, A.M.B.'s cause of action was not to seek a declaration of paternity, but *inter alia*, an award of custody.

Although a DNA test showed J.B.U. was the child's biological father, he neither challenged A.M.B.'s paternity nor did he seek a declaration of his own paternity upon which the trial court could make such a determination. If J.B.U. had sought declaration of his own paternity and presented evidence to support such a claim, the trial court would then have been required to determine the minor child's "natural" father when confronted with conflicting presumptions: the legal paternity of A.M.B. established by the acknowledgment pursuant to Section 210.823.1, and the subsequent DNA test confirming that J.B.U. is the minor child's biological father pursuant to Section 210.834. The court must then declare one of the two to be

5

the natural father based upon the evidence and "the weightier considerations of policy and logic." See Section 210.822.2. In the event J.B.U. was properly declared the father then I would concur with the majority's excellent analysis that third-party custody was supported by the evidence in the record before us.

However, J.B.U. did not assert his paternity, nor did he seek to have his name added to the minor child's birth certificate as ordered by the trial court. It appears the trial court erroneously determined the DNA test, without the biological father asserting his rights, somehow resulted in the conclusion that J.B.U. was the minor child's "natural" or legal father. The trial court's error in amending the birth certificate, in the absence of a proper pleading upon which to do so, creates the aforementioned legal morass. As a result, I concur in the majority's decision to reverse the trial court's judgment in this regard. Once J.B.U. is properly removed from the birth certificate, he becomes a legal non-entity in the minor child's life for purposes of this proceeding.

The majority's decision to properly remove J.B.U. from the minor child's birth certificate also requires reversal of third-party custody to avoid the inconsistent result of awarding A.M.B. third-party custody of his own child. Here, the minor child has effectively been deprived of his proper custodian as a result of the court's erroneous application of the law in improperly adding J.B.U. to the child's birth certificate and awarding third-party custody to A.M.B., the minor child's legal father. In addition to reversing to amend the birth certificate, I would also reverse with instructions to amend the term "third-party" to "sole physical" with respect to the award of custody to A.M.B.

Lisa P. Page, Chief Judge

6